271 P.3d 621

### ALOHACARE, Petitioner/Appellant–Appellant,

v.

### Gordon I. ITO, Insurance Commissioner, State Of Hawai'i Department of Commerce and Consumer Affairs, Respondent/Appellee–Appellee,

and

### United HealthCare Insurance Company dba Evercare; WellCare Health Insurance of Arizona, Inc., dba Ohana Health Plan and affiliates; and Department of Human Services, State of Hawai'i, Respondents/Intervenors–Appellees–Appellees.

### No. SCAP–30276.

Supreme Court of Hawai'i.

Jan. 25, 2012.

Edward C. Kemper for petitioner/appellant-appellant.

James F. Nagle, Deputy Attorney General, for respondent/appellee-appellee.

John F. Molay, Deputy Attorney General, for respondent/intervenor-appellee-appellee Department of Human Services.

Dianne W. Brookins (Alston Hunt Floyd & Ing) for respondent/intervenor-appellee-appellee United HealthCare Insurance Co.

Lorraine H. Akiba (McCorriston Miller Mukai MacKinnon) for respondent/intervenor-appellee-appellee Wellcare Health Insurance of Arizona, Inc., dba Ohana Health Plan.

RECKTENWALD, C.J., DUFFY, J., Circuit Judge NISHIMURA, assigned in place of NAKAYAMA, J., Recused, and Circuit Judge LEE, assigned by reason of vacancy, with ACOBA, J., concurring and dissenting separately.

Opinion of the Court by
RECKTENWALD, C.J.

AlohaCare, a health maintenance organization, submitted a proposal to the Department of Human Services to bid for a Quest Expanded Access contract to provide healthcare services for aged, blind, or disabled participants in the State's Medicaid program. AlohaCare was not one of the successful bidders. The Department of Human Services instead awarded Quest Expanded Access contracts to United HealthCare Insurance Company, dba Evercare (United), and WellCare Health Insurance of Arizona, Inc., dba Ohana Health Plan (Ohana).

AlohaCare petitioned the Insurance Commissioner of the Department of Commerce and Consumer Affairs for declaratory relief that accident and health insurers like United and Ohana were not properly licensed to carry out the activities called for under the Quest Expanded Access contracts and that a health maintenance organization license issued pursuant to the Health Maintenance Organization Act, Hawai'i Revised Statutes chapter 432D, quoted *infra,* was instead required. The Insurance Commissioner concluded that a health maintenance organization license was not required to offer the Quest Expanded Access managed care product because the services required under the contracts were not services that can be provided only by a health maintenance organization. On appeal to the circuit court, AlohaCare argued that the Insurance Commissioner's Decision was wrong, and, in effect, nullified the Health Maintenance Organization Act. The circuit court upheld the Decision of the Insurance Commissioner. On appeal, AlohaCare challenges the circuit court's judgment in favor of United, Ohana, the Department of Human Services and the Insurance Commissioner.

As set forth below, we hold that AlohaCare has standing to appeal the Insurance Commissioner's Decision. We further hold that both accident and health insurers and health maintenance organizations are authorized to offer the closed panel or limited physician group model of care required by the Quest Expanded Access contracts. We conclude that this holding does not nullify the Health Maintenance Organization Act. Accordingly, we affirm the circuit court's judgment.

## I. BACKGROUND

The following facts are taken from the agency record on appeal, the circuit court record on appeal, including transcripts of the proceedings before the circuit court, and the Insurance Commissioner's unchallenged findings of fact.

### A. The QExA Request for Proposals

On October 10, 2007, the Department of Human Services (DHS) issued Request for Proposals (RFP) No. RFP–MQD–2008–006 "QUEST Expanded Access (QExA) Managed Care Plans to Cover Eligible Individuals Who Are Aged, Blind, or Disabled." The RFP provided, in part:

> This [RFP] solicits participation by *qualified and properly licensed health plans* to provide required service coordination, outreach, improved access, and enhanced quality healthcare services through a *managed care* system for the State's Medicaid aged, blind or disabled (ABD) members who are currently not covered through a managed care system across the continuum of care. The services shall be provided in a *managed care environment* with reimbursement to qualifying health plans based on fully capitated rates for each island.

(Emphasis added).

The RFP defined "managed care" as "[a] comprehensive approach to the provision of healthcare that combines clinical services and administrative procedures within an integrated, coordinated system to provide timely access to primary care and other necessary services in a cost-effective manner." The RFP further provided that "QExA is a managed care program and, as such, all acute, pharmacy and long-term care services to members shall be provided in a managed care system."

Regarding licensure, the RFP provided that:

> The health plan shall be properly licensed as a health plan in the State of Hawaii (See [Hawai'i Revised Statutes (HRS) chapters 431, and 432, and 432D] ). *The health plan need not be licensed as a federally qualified HMO,* but shall meet the requirements of Section 1903(m) of the Social Security Act [ (42 U.S.C. § 1396(m)) ] and the requirements specified by the DHS.

(Emphasis added).

The RFP's definition of "Health Maintenance Organization (HMO)" referred to its definition of "Managed Care Organization," which stated:

> An entity that has, or is seeking to qualify for, a comprehensive risk contract under the final rule of the [federal Balanced Budget Act of 1997] and that is: (1) a federally

qualified HMO that meets the requirements under Section 1310(d) of the Public Health Service Act; (2) any public or private entity that meets the advance directives requirements and meets the following conditions: (a) makes the service it provides to its Medicaid members as accessible (in terms of timeliness, amount, duration, and scope) as those services that are available to other Medicaid enrollees within the area served by the entity and (b) meets the solvency standards of 42 CFR Section 438.116 and HRS § 432D–8.

The RFP also defined the term "Participating" as

[w]hen referring to a provider, a healthcare provider who is employed by or who has entered into a contract with the health plan to provide covered services to members. When referring to a facility, a facility which is owned and operated by, or which has entered into a contract with the health plan for the provision of covered services to members.

The RFP required that successful bidders "develop and maintain a provider network that is sufficient to ensure that all medically necessary covered services are accessible and available" to plan members. To that end, the RFP set forth the minimum size of the plan's provider network, including the number of primary care physicians, specialists and hospitals required on each island. Under the QExA RFP, if the health plan is unable to provide medically necessary covered services to a member within its network or on the island of residence, then the health plan must provide the services out-of-network or transport the member to another island to access the services.

No party disputes that the QExA RFP contemplated the provision of a "closed panel" plan, "meaning that care must be ob-

tained from the contracted network of providers if it is available within the network."

## B. AlohaCare, United, and Ohana's eligibility to offer the product required by the QExA RFP

AlohaCare alleges, and the other parties do not dispute, that AlohaCare is licensed as a health maintenance organization under HRS chapter 432D.[1] United and Ohana are licensed as accident and health insurers under HRS chapter 431:10A, quoted *infra*. It is undisputed that United and Ohana are not licensed as health maintenance organizations under HRS chapter 432D.

On October 30, 2007, prior to submitting its application in response to the RFP, United inquired by letter to the Insurance Division as to whether United would be able to offer the closed panel managed care product called for under the RFP pursuant to its accident and health insurer license. The Health Branch Administrator at the Insurance Division responded to United by letter on November 1, 2007, stating that the plain text of HRS § 431:10A–205(b) would not allow United to offer a "closed panel or limited physician group HMO model of care." [2]

United replied by letter on November 12, 2007 providing additional information and requesting a clarification of the Health Branch Administrator's letter. On November 13, 2007, after conferring with the Insurance Commissioner, the Insurance Division reversed its interpretation of HRS § 431:10A–205(b), stating that "our interpretation is that the referenced statute does *not* prohibit offering a closed panel HMO product for Medicaid–Quest under the accident and health license." (Emphasis in original). On November 16, 2007, the Insurance Division communicated by letter to United that its "[r]e-

---

1. HRS § 432D–1 defines a "[h]ealth maintenance organization" as "any person that undertakes to *provide* or *arrange* for the delivery of basic health care services to enrollees on a prepaid basis, except for enrollee responsibility for copayments, deductibles, or both." (Emphasis added).

2. HRS § 431:10A–205(b) (2005) provides:
 Any group or blanket disability policy may provide that all or any portion of any indemni-

ties provided by the policy on account of hospital, nursing, medical, or surgical services may, at the insurer's option, be paid directly to the hospital or person rendering such services, *but the policy may not require that the service be rendered by a particular hospital or person.* Payment so made shall discharge the insurer's obligation with respect to the amount so paid. (Emphasis added).

sponse in the November 13, 2007 letter is based upon the information and/or documentation provided by [United] and is informational in nature." On April 24, 2008, the Health Branch Administrator provided a similar opinion to Ohana.[3]

On February 1, 2008, DHS awarded the QExA contracts to United and Ohana. That same day, DHS sent AlohaCare a letter informing AlohaCare that it was not chosen by DHS as one of the health plans selected to provide the services in the QExA RFP. The letter informed AlohaCare that the two health plans chosen for the contract were Ohana and United. The letter also informed AlohaCare that DHS was

> returning your business proposal(s) which [were] unopened. Unfortunately, your proposal did not meet the technical requirements necessary to forward the busi-

ness proposal on for review by our actuaries. Enclosed are a copy of your proposal evaluation worksheet for your technical proposal and a copy of the Consensus Score Sheets used in the technical proposal review.

On February 4, 2008, the contracts were executed.[4]

## C. Proceedings before the Insurance Commissioner

On October 28, 2008, AlohaCare filed its Petition for Hearing and Declaratory Relief with the Insurance Commissioner of the DCCA. AlohaCare asserted that it was both an "interested party" and an "aggrieved person."[5] The Petition named Jeffrey P. Schmidt, Insurance Commissioner, as the sole respondent. AlohaCare sought, inter alia, an "official determination" that Ohana

---

3. The April 24, 2008 letter stated, in pertinent part:

 Insurance Commissioner J.P. Schmidt has taken the position that an accident and health or sickness insurer under HRS article 431:10A or a mutual benefit society under HRS chapter 432 can write an HMO product. Therefore, it is our position that [Ohana] could write QUEST HMO product business under its existing license. . . .

 The matter is not free from doubt, however, due to language contained in HRS Section 431:10A–205(b) and HRS section 432D–2(a). We think there are good arguments that the language in these sections does not prohibit the writing of an HMO product under another type of license. That said, you should undertake your own evaluation of the issues and risks.

4. AlohaCare subsequently challenged the contracts in a variety of ways. On February 22, 2008, AlohaCare filed a protest of the QExA contract awards with the DHS Director pursuant to HRS § 103F–501(b) (Supp.2008), arguing, inter alia, that United and Ohana were ineligible for the QExA contracts on various grounds. This protest did not raise improper licensure as a ground. The DHS Director upheld the procurement award. AlohaCare moved for reconsideration pursuant to HRS § 103F–502(c) (Supp. 2008) and the Chief Procurement Officer upheld the procurement award. AlohaCare appealed to the Department of Commerce and Consumer Affairs (DCCA) for administrative review, and the DCCA dismissed the appeal for lack of jurisdiction. AlohaCare appealed the dismissal to the circuit court. The circuit court upheld the dismissal, and the ICA affirmed. *AlohaCare v. Dep't of Human Servs.*, No. 29630, 2011 WL 3250430 (Haw.App. July 28, 2011). AlohaCare subse-

quently filed an application for a writ of certiorari, which this court accepted on December 12, 2011.

Additionally, on May 8, 2008, AlohaCare filed suit in the United States District Court for the District of Hawai'i (district court) alleging violations of federal law and the United States Constitution. The district court dismissed the action, *AlohaCare v. Dep't of Human Servs.*, 567 F.Supp.2d 1238, 1265 (D.Haw.2008), and the Ninth Circuit Court of Appeals upheld the dismissal, *AlohaCare v. Dep't of Human Servs.*, 572 F.3d 740, 747 (9th Cir.2009).

5. "[A]ny *interested person* may petition [any authority of the DCCA] for a *declaratory ruling* as to the applicability of any statutory provision or of any rule or order adopted by the authority to a factual situation." Hawai'i Administrative Rules (HAR) § 16–201–48 (1990) (emphasis added); *see also* HRS § 91–8 (1993).

 "[A]ny *aggrieved person* may petition the authority or hearings officer for a *hearing* to resolve a contested matter, including license denials, within the authority's jurisdiction." HAR § 16–201–26 (1990) (emphasis added).

 HAR § 16–201–2 (1990) defines "aggrieved person," as used in HAR chapter 201, as:

 any person who shall be adversely affected by an action, decision, order or rule of the authority or who shall be adversely affected by the action or conduct of any person if the action or conduct is within the authority's jurisdiction to regulate, and shall also include any person who requires the authority's permission to engage in or refrain from engaging in an activity or conduct which is subject to regulation by the authority.

"is not licensed pursuant to the HMO Act and is therefore not properly licensed to perform the QExA [c]ontract." [6]

In AlohaCare's memorandum accompanying its Petition, AlohaCare argued, inter alia, "that the work to be conducted under the [QExA] contract is covered only by Hawaii's [HMO] statute and therefore can legally be performed only by entities that hold Hawaii HMO licenses." In support of that proposition, AlohaCare argued that the QExA RFP involved the performance of "HMO activities" and that "*any* entity performing HMO activities as described in the HMO Act must have an HMO license." [7] (Emphasis in original).

On December 8, 2008, DHS, which had not yet intervened in the proceeding,[8] filed an Amended Motion to Dismiss the Petition in which United and Ohana joined. DHS argued that DHS "does not believe that its contracts with Ohana and [United] are contracts relating to the business of insurance[,]" and therefore, DHS argued, the Insurance Commissioner "does not possess the power" to provide the relief AlohaCare requests because it would exceed the statutory authority of the Insurance Commissioner. The Insurance Commissioner denied the motion.

United subsequently filed its memorandum in opposition to the Petition, in which it contended that federal law did not require Medicaid managed care organizations to be licensed as HMOs. United further argued that Hawaiʻi law does not require an HMO license to provide the QExA product because United's "provision of the QExA product is not precluded by HRS § 431:10A–205(b)"

and "the QExA program is 'managed care,' not an 'HMO activity.'" (Formatting altered).

Ohana filed a memorandum in opposition to the Petition in which it argued, inter alia, that Hawaiʻi law permits Ohana to provide the services under the QExA contract because the HMO Act does not require Ohana to possess an HMO license to perform such services. Accordingly, Ohana argued that it was permitted under its accident and health insurance license to provide the services under the QExA contract. Ohana also argued that the Insurance Commissioner lacked jurisdiction to review the QExA contract because the contract executed between DHS and Ohana was not a contract of insurance.

On March 18, 2009, the Petition was heard and argued before hearings officer Thomas M. Pico, Jr.[9] On April 27, 2009, the hearings officer issued his Recommended Decision. On June 2, 2009, the Insurance Commissioner issued his Decision, relying on the hearings officer's Recommended Decision. The Decision contained Findings of Fact (FOFs) that discussed the terms of the QExA contracts and recounted the RFP process. The Decision also contained the following Conclusions of Law (COLs):

1. Petitioner is an "interested party" and so had standing to file this Petition for declaratory relief pursuant to [HAR] § 16–201–48.

2. Petitioner is also an "aggrieved person" within the meaning of HAR § 16–201–2, because Petitioner will be "adversely affected" by a decision of the Commissioner with respect to the type of license required to offer the QExA plan since a finding by the Commissioner that [United] and/or [Ohana] are properly licensed to

6. AlohaCare did not make any explicit allegations concerning United in either the Petition or AlohaCare's memorandum accompanying the Petition. However, AlohaCare's contention that an HMO license was required under Hawaiʻi law to perform the QExA contract would apply equally to Ohana and United, which are both licensed as accident and health insurers under HRS chapter 431:10A.

7. Although AlohaCare's Petition raised additional arguments regarding the validity of the contracts, the Insurance Commissioner did not address these arguments, and they are not at issue in this

appeal. Accordingly, these arguments are not discussed further.

8. On January 7, 2009, the Insurance Commissioner entered orders granting motions to intervene filed by DHS, United and Ohana. On January 9, 2009, the Insurance Commissioner entered an amended order granting United's motion to intervene that did not substantively affect the prior order.

9. The agency record on appeal does not contain a transcript of the March 18, 2009 hearing.

perform the services required under the QExA contracts in issue ... is effectively a finding that those entities can compete against Petitioner for an award of the QExA contract in issue.

3. HAR § 16–201–50(1) [10] requires that a petition for declaratory relief be denied where "[t]he matter is not within the jurisdiction of the authority" and where "[t]he petition is based on hypothetical or speculative facts of either liability or damages." *Cf. Citizens Against Reckless Development v. Zoning Bd. of Appeals,* 114 Hawai'i 184, 194–95, 159 P.3d 143, 153–54 (2007) (explaining that an administrative agency has discretion to deny declaratory relief on a ground enumerated in an agency rule). The Petition raised issues of interpretation of the Hawaii Insurance Code that are within the jurisdiction of the Hawaii Insurance Commissioner to interpret.

4. The QExA contracts entered into by DHS with [Ohana] and [United] are not contracts of insurance. HRS § 431:1–201(a) provides that "[i]nsurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." Accordingly, determining the validity of the QExA contracts is not the business of insurance and is outside the jurisdiction of the Commissioner. Except for relief in the form of a declaration that neither [United] nor [Ohana] are properly licensed to perform the services required under the QExA contract, all other claims for relief based upon allegations of the Petition regarding the validity of the contracts entered into by DHS with [Ohana] and [United] are denied as beyond the jurisdiction of the authority. HAR § 16–201–50(1)(C).

5. The Petition also relies upon speculative and hypothetical allegations regarding actions which may (or may not) be taken by the Centers for Medicare & Medicaid Services ("CMS"). Relief based upon those allegations is denied pursuant to HAR § 16–201–50(1)(D). *Cf. Bremner v. City & County of Honolulu,* 96 Hawai'i 134, 144, 28 P.3d 350, 360 (App.2001) (speculative nature of concerns regarding how city would administer ordinance and effect of ordinance led court to conclude that matter was not ripe for adjudication).

6. The issue to be decided in this matter is whether a license issued pursuant to the Health Maintenance Organization Act, HRS Chapter 432D ("the HMO Act") is required to perform the QExA contract. If so, neither [United] nor [Ohana] are properly licensed to perform the services required under the QExA contracts.

7. The determination of the issue to be decided in this matter involves interpretation of HRS §§ 431:1–201, 431:1–205 and HRS Chapters 432D, 432E, and 431:10A. All of these statutes are within the jurisdiction of the Insurance Commissioner.

8. Insurance is "a contract whereby one party undertakes to indemnify another or pay a specified amount upon determinable contingencies[."] HRS § 431:1–201. Under this general definition, there are several classes of insurance, one of which is accident and health and sickness insurance. Accident and health insurance, as defined in HRS § 431:1–205, is "insurance against bodily injury, disablement, or death by accident, or accidental means, or the expense thereof; against disablement or expense resulting from sickness; and every insurance appertaining thereto, including health and medical insurance." [Ohana] and [United] are each licensed as risk-bearing entities to provide accident and health or sickness insurance pursuant

10. HAR § 16–201–50(1) (1990) provides:

The authority, as expeditiously as possible after the filing of a petition for declaratory relief, shall:

(1) Deny the petition where:

(A) The petition fails to conform substantially with section 16–201–48 or is not supported by a memorandum of law in support of the petition;

(B) The petition is frivolous;

(C) The matter is not within the jurisdiction of the authority;

(D) The petition is based on hypothetical or speculative facts of either liability or damages;

(E) There is a genuine controversy of material fact, the resolution of which is necessary before any order or declaratory relief may issue; or

(F) There is any other reason justifying denial of the petition.

to HRS Chapter 431:10A but not Chapter 432D, the HMO Act.

9. The QExA plan is also governed by federal law relating to the Medicaid program. The Social Security Act § 1903(m) and federal regulation at 42 C.F.R § 438.116(b)(1) expressly state that a Medicaid managed care organization ("MCO") may be either a federally qualified HMO or "be licensed or certified by the State as a risk bearing entity."

10. Hawaii law does not support a conclusion that the QExA plan must be provided by an HMO because the QExA program does not require the entity to provide services that can only be provided by an HMO under Hawaii law.

11. HRS § 432E–1 defines a "managed care plan" to mean "any plan, regardless of form, offered or administered by any person or entity, including but not limited to an insurer governed by chapter 431, a mutual benefit society governed by chapter 432, a health maintenance organization governed by chapter 432D, a preferred provider organization, a point of service organization, a health insurance issuer, a fiscal intermediary, a payor, a prepaid health care plan, and any other mixed model, that provides for the financing or delivery of health care services or benefits to enrollees through:

 (1) Arrangements with selected providers or provider networks to furnish health care services or benefits; and

 (2) Financial incentives for enrollees to use participating providers and procedures provided by a plan;

provided, that for the purposes of this chapter, an employee benefit plan shall not be deemed a managed care plan with respect to any provision of this chapter or to any requirement or rule imposed or permitted by this chapter which is superseded or preempted by federal law."

12. HRS § 432D–1 defines a "health maintenance organization" to mean "any person that undertakes to provide or arrange for the delivery of basic health care services to enrollees on a prepaid basis, except for enrollee responsibility for co-payments, deductibles, or both."

13. HRS § 432D–2(a) provides that "[n]o person shall establish or operate a health maintenance organization in this State without obtaining a certificate of authority under this chapter." There is no definition of what it means to "operate a health maintenance organization" in Chapter 432D HRS. Nor is there any definition of "HMO activities" or "HMO product."

14. The term "operate a health maintenance organization" as used in HRS § 432D–2(a) is thus interpreted to mean engaging in activities which only an HMO is authorized to do. If a risk bearing entity licensed by the Insurance Division under a statute other than HRS Chapter 432D is authorized to engage in the activities it has undertaken by the statute pursuant to which it is licensed, it is not by virtue of its engaging in permitted activities, "operat[ing] a health maintenance organization" within the prohibition of HRS § 432D–2(a).

15. The definition of a "managed care plan" in HRS § 432E–1 encompasses all types of plans that provide for the financing or delivery of health care services that meet the criteria of that section, including HMOs licensed under HRS Chapter 432D and risk bearing entities licensed under HRS Chapter 431:10A.

16. There is substantial overlap between the powers granted to health maintenance organizations under HRS Chapter 432D and entities licensed under HRS Chapter 431:10A. The key distinction is that HMOs are the only licensed entities that may furnish health care directly to their members through facilities that it owns or operates and utilizing the services of physicians employed by the HMO and require that coverage is only provided when a member either utilizes its facilities and providers or is specifically authorized by its providers to utilize outside facilities or providers. An entity licensed as an HMO is not limited to furnishing care directly to its members through its owned facilities and employed providers, but it is authorized to do so. That authorization distin-

guishes entities licensed as HMOs from other risk-bearing entities licensed by the Insurance Commissioner in the State of Hawaii. Conversely, risk bearing entities licensed under HRS Chapter 431:10A are prohibited from requiring that "service[s] be rendered by a particular hospital or person." HRS § 431:10A–205(b). For AlohaCare to prevail in this matter, the law would have to define an HMO in terms of having a closed panel. The law simply does not do so.

17. HRS Chapter 393, the Hawai'i Prepaid Health Care Act, confirms that a distinguishing feature of an HMO is its ability to furnish care directly to its members. In defining what constitutes a "prepaid health care plan," HRS § 393–3 distinguishes plans which "furnish" health care from plans which "defray or reimburse, in whole or in part, the expenses of" health care. The prevalent plan in Hawaii of the type which "furnishes" health care is the HMO offered by Kaiser Foundation Health Plan, Inc.

18. The rules of statutory interpretation avoiding implied amendment or repeal further support the conclusion that, so long as a risk bearing entity licensed by the Insurance Division under a statute other than HRS Chapter 432D is authorized to engage in the activities it has undertaken by the statute pursuant to which it is licensed, it is not by implication prohibited from doing so by HRS § 432D–2(a).

19. Had the QExA program been designed solely for HMOs, the enrollees would have been limited to health care services furnished directly to QExA enrollees through facilities owned or operated by the HMO, and utilizing the services of physicians employed by the HMO.

20. Both [United] and [Ohana] are licensed as riskbearing entities pursuant to HRS Chapter 431:10A. There is no prohibition under Hawaii law which prevents an insurer licensed under HRS Chapter 431:10A from offering the closed panel product required by the QExA RFP.

21. HRS § 431:10A–205(b) states that "[a]ny group or blanket disability policy may provide that all or any portion of any indemnities provided by the policy on account of hospital, nursing, medical, or surgical services may, at the insurer's option, be paid directly to the hospital or person rendering such services, *but the policy may not require that the service be rendered by a particular hospital or person.* Payment so made shall discharge the insurer's obligation with respect to the amount so paid." ([Emphasis] added).

22. Insurers licensed pursuant to HRS Chapter 431:10A are not authorized to "require that the [covered health care] service be rendered by a particular hospital or person." The plain meaning of the statute prohibits a restriction that limits insureds to receiving care from "a particular," or a single, designated hospital or person.

23. Insurers licensed under HRS Chapter 431:10A are not prohibited from offering a closed panel or limited physician group model of care by HRS § 431:10A–205(b) as long as there is a choice of providers and hospitals for its members.

24. There is nothing in the legislative history of HRS § 431:10A–205(b) to support an interpretation of the provision as precluding the offering of a closed panel product such as that required by the QExA program. That provision has remained virtually unchanged since it was enacted in 1955, while Hawaii was still a territory.

25. The statutory language cannot have been intended to prohibit closed panel or limited physician group models of care, as those managed care models have only developed in recent times. Moreover, if the Legislature had intended to prohibit insurers from requiring that services be obtained from a defined network of providers, the statutory language would have used the plural form instead of the singular ("particular hospitals or persons").

26. The language used in 1955 was taken from a model law proposed by the National Association of Insurance Commissioners. It is statutory language of differentiation, by which policy designs that would permit the insurer to direct the destiny of the cure through the specific designation of the person or facilities are prohibited. The phrase "may not require that the service

be rendered by a particular hospital or person" distinguishes accident and sickness policy standards from the standards of the Workmens' Compensation Laws common at that time that expressly permitted an employer to select for the treatment of his employee, specific physicians, hospitals and even specific nurses. (*See, Insurance Com'rs v. Mutual Medical Ins., Inc.,* 251 Ind. 296, 241 N.E.2d 56 (1968)).

27. HRS § 431:10A–205(b) was intended to prevent insurance companies from requiring that their insureds receive their care from a single hospital or physician under contract with the insurer. Based on the plain language and the legislative history of HRS § 431:10A–205(b), there is no reason to conclude the statute was intended to prohibit insurers from offering a closed panel product with the choice of providers required by the QExA.

28. The fact that the QExA RFP provided for reimbursement to qualifying health plans at fully capitated rates did not require that those QExA plans be licensed as HMOs in the State of Hawaii.

29. Petitioner had both the burden of proof and the burden of persuasion. Petitioner has failed to carry its burden of proof and persuasion regarding its allegations. There is no legal basis for concluding that an HMO license is required for [United] and [Ohana] to offer the QExA plan.

(Some brackets in original and some added) (record citations omitted) (some formatting altered) (emphasis in original).

11. HRS § 91–14 (2004) provides, in pertinent part:

> (a) *Any person aggrieved by a final decision and order in a contested case* or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief *is entitled to judicial review thereof under this chapter;* but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.

Based on the Decision's FOFs and COLs, the Insurance Commissioner ordered that:

1. The Amended Motion to Dismiss filed by DHS on December 8, 2008, is denied on the grounds that the Commissioner has jurisdiction; and,

2. An HMO license is not required to offer the QExA managed care plan. The QExA managed care plan may be offered by any risk-bearing entity licensed by the Insurance Division, [DCCA], State of Hawaii; and

3. There is no legal or factual grounds for relief under the Petition, and thus all relief requested in the Petition is denied.

## D. Appeal to the circuit court

On July 2, 2009, AlohaCare timely appealed the Insurance Commissioner's Decision to the circuit court pursuant to HRS § 91–14.[11] AlohaCare argued that it was an "aggrieved person" as that term is used in HAR § 16–201–2 because it was "adversely affected by the Insurance Commissioner's decision."[12] AlohaCare's arguments on the merits centered on the contention that the HMO Act requires an entity to have an HMO license in order to conduct "HMO activities[.]"

United [13] argued, inter alia, that AlohaCare's interpretation of the HMO Act, which was passed in 1995, improperly nullified a portion of the definition of a "managed care plan" in the Patients' Bill of Rights and Responsibilities Act (hereinafter Patients' Bill of Rights Act), which was passed in 1998.[14] The Insurance Commissioner ar-

(Emphasis added).

12. This argument was made in AlohaCare's Statement of the Case. AlohaCare's opening brief to the circuit court did not address its standing to appeal the Insurance Commissioner's Decision.

13. Ohana and DHS joined United's Answering Brief to the circuit court.

14. The Patients' Bill of Rights Act defines a "[m]anaged care plan" as:

> "Managed care plan" *means any plan,* regardless of form, *offered or administered by any person or entity, including but not limited to an insurer governed by chapter 431,* a mutual benefit society governed by chapter 432, *a health maintenance organization governed by chapter*

gued, inter alia, that AlohaCare was not a "person aggrieved" under HRS § 91–14(a) and lacked standing to appeal because "the purported interest of AlohaCare in having a competitive advantage from its HMO license is not a legally protected interest sufficient to confer standing ... under HRS chapter 91."

On July 28, 2009, DHS filed a motion to dismiss for lack of jurisdiction arguing, inter alia, that AlohaCare did not have standing to appeal pursuant to HRS § 91–14 because it was not an "aggrieved person," and HRS chapter 432D does not confer a private right of action that AlohaCare could enforce. In response, AlohaCare argued that it had standing to appeal as an aggrieved person.[15]

On September 16, 2009, the circuit court held a hearing on DHS's motion. At the outset of the hearing, AlohaCare clarified that, although AlohaCare's petition for declaratory relief was brought pursuant to HRS § 91–8, its appeal of that ruling was brought pursuant to HRS § 91–14. United argued that:

> In the proceeding before the Insurance Commissioner, the petition for declaratory relief, it was sufficient for AlohaCare to be an interested party, and it could proceed as an interested party. In that proceeding, there's a different standard. Aggrieved is a different level of involvement, a different level of impact. And so that was the argument that we made below, that certainly they're an interested party, the Commissioner can go ahead and decide the issue because it's an important issue, but that AlohaCare was not aggrieved because it just simply failed to meet the definition of an aggrieved party. *And under [HRS § ] 91–14, I believe a party has*

*to be aggrieved in order to have a right to appeal.* That was the distinction.

(Emphasis added).

United further argued that:

> only that subset of interested persons that are actually aggrieved ... is going to be allowed access to the courts in an appeal. So it's not as if no one that files a declaratory relief petition can seek appellate review.... The way it works together is that you can't be merely interested. You must also be aggrieved in order to take up the resources of the Judiciary in an appellate setting.

DHS agreed with United, and argued that, "under [HRS § ] 91–8, an interested party can bring a declaratory relief action or a declaratory judgment action. But in order to [appeal to circuit court], you have to be an aggrieved person, not an interested person or interested party."

Although AlohaCare argued that declaratory rulings under HRS § 91–8 were appealable to the circuit court under HRS § 91–14 pursuant to *Lingle v. Hawaii Government Employees Association,* 107 Hawai'i 178, 111 P.3d 587 (2005), it did not argue that it could appeal the Insurance Commission's Decision without being aggrieved. Nevertheless, AlohaCare argued that the Insurance Commissioner's determination that AlohaCare had "two bases for standing below," i.e., as an interested party and as an aggrieved party, was not clearly erroneous.

AlohaCare further argued that it was aggrieved because it suffered an actual or threatened injury, which was traceable to the Insurance Commissioner's Decision, and that a favorable decision would provide relief for its injury. With regard to its actual or threatened injury, AlohaCare argued that the

---

432D, a preferred provider organization, a point of service organization, a payor, a prepaid health care plan, and any other mixed model, *that provides for the financing or delivery of health care services or benefits to enrollees* through:

 (1) *Arrangements with selected providers or provider networks to furnish health care services or benefits;* and

 (2) *Financial incentives for enrollees to use participating providers and procedures provided by a plan;*

provided, that for the purposes of this chapter, an employee benefit plan shall not be deemed a managed care plan with respect to any provision of this chapter or to any requirement or rule imposed or permitted by this chapter which is superseded or preempted by federal law.

HRS § 432E–1 (2000) (emphasis added).

**15.** AlohaCare did not argue that it had standing to appeal as an "interested person" pursuant HRS § 91–8.

Insurance Commissioner's Decision would "impact AlohaCare's business in the future[,]" and that AlohaCare faced burdens in excess of those faced by its competitors because it was required to maintain its HMO license. AlohaCare conceded that the Insurance Commissioner's Decision could not declare United's and Ohana's QExA contracts null and void, but that

> [t]he effect of what the Insurance Commissioner would decide would have an impact on DHS and their requirement that the entity be properly licensed. In other words, their RFP says you have to be properly licensed. If [the circuit court] or the Insurance Commissioner said they're not properly licensed, that ends their contract. But ... this ruling goes beyond simply that particular contract. It affects the whole operation of AlohaCare in the future.

The circuit court took the matter under advisement, noting that, "[i]f there is a showing of aggrieved party as that is understood under [HRS § 91–14], then I will have jurisdiction[.]" On September 29, 2009, the circuit court entered a minute order, stating its intent to deny the motion and noting that "the court is persuaded on the basis of the rationale in [*Lingle*] that the court has jurisdiction over this matter[.]" On October 22, 2009, the circuit court filed an order denying the motion without providing further reasoning.[16]

On December 23, 2009, the circuit court heard oral argument on the merits of AlohaCare's appeal and orally affirmed the Decision of the Insurance Commissioner, on the ground that the Decision was entitled to deference and "properly interpreted" the statutes "to require reconciliation of the overlapping structure[.]" The circuit court's decision and order affirming the Insurance Commissioner's June 2, 2009 Decision, Findings of Fact, Conclusions of Law and Order,

was filed on December 28, 2009. The circuit court's judgment was also filed on December 28, 2009.

### E. Appeal to the ICA

AlohaCare timely filed a Notice of Appeal to the ICA on January 5, 2010 and the appeal was fully briefed in the ICA. AlohaCare's application for transfer of the appeal to this court was accepted on October 12, 2010.

#### 1. AlohaCare's opening brief

In its opening brief, AlohaCare argues that "[t]he HMO Act requires an entity that meets that Act's description of an HMO to obtain a certificate of authority (license) from the Insurance Commissioner prior to engaging in an HMO Act covered activity." In support of this argument, AlohaCare contends that the "legislature that passed the HMO Act did so based on an understanding that the 'field' of activities to which the Act applied (and for which it required a license) was not then subject to State insurance regulation" and that the April 24, 2008 letter from the Insurance Division to United "was the exact opposite of the understanding of the legislature that passed the HMO Act."

Next, AlohaCare contends that the Insurance Commissioner's Decision reaches inconsistent conclusions. For example, AlohaCare notes that "the [D]ecision holds that although [Ohana] and United are licensed or certified as risk-bearing entities, the certification or license both hold does not extend to their conduct under their QExA contracts."[17] As such, "they were and are performing their QExA contracts under no licensing authority."

Finally, AlohaCare argues that the Decision ignored canons of statutory construction when it considered the overlap between HRS chapter 431:10A and HRS chapter 432D. Specifically, AlohaCare argues that the plain

---

16. Subsequently, during argument on the merits of the appeal, the circuit court explained that "[AlohaCare] is aggrieved in a sense that the context in which the matter arises is one that impacts potential future competition."

17. This statement somewhat misstates the Insurance Commissioner's conclusion. As noted *su-*

*pra,* the Insurance Commissioner held in COL 4 that "[t]he QExA contracts entered into by DHS with [Ohana] and [United] are not contracts of insurance." However, as discussed *infra,* United and Ohana's conduct under their QExA contracts with QExA members does involve the provision of insurance.

language of the HMO Act is clear and unambiguous and the Insurance Commissioner should not have departed from the clear and unambiguous language. AlohaCare further argues that even if the terms in HRS chapter 432D could be construed as ambiguous, "the proper course of action is to look to a dictionary to determine the ordinary meaning." Accordingly, AlohaCare argues that the Decision "is contrary to [the] unambiguous language of the HMO Act and contravenes the legislature's stated intent of regulating HMOs in Hawaii." Finally, AlohaCare argues the HMO Act should be given full effect because the HMO Act " 'covers the whole subject which it relates,' all the way down to telling indemnity insurance licensees what to do to be HMOs."

### 2. United's arguments

United[18] contends that it and Ohana are properly licensed to provide the QExA program. United makes three points in support of this contention. First, United states that the QExA program expressly called for a "managed care program," not a managed care program provided by an HMO, and that the services required under the QExA contract are not "HMO activity"—"a term made up by AlohaCare that appears nowhere in the HMO Act or its legislative history." Second, United contends that "AlohaCare's interpretation of the HMO Act would require that all health plan coverage required to be provided by employers under the Hawaiʻi Prepaid Health Care Act, HRS [c]hapter 393, be provided by a licensed HMO." Third, United argues that "AlohaCare's interpretation of the HMO Act would improperly nullify a later enacted statute, HRS [c]hapter 432E, whereas the Commissioner's interpre-

tation successfully reconciled these two statutes and gave meaning to both."

United also argues that the "Commissioner's Decision is supported by established rules of statutory construction" and that the language of the HMO Act is not clear and unambiguous. United also contends that using a dictionary to define terms in HRS chapter 432D is not helpful, since "the issue [is] whether it [is] possible to construe [HRS chapters] 432D, 432E and 431:10A in such a way so as to give all of the statutes reasonable meaning and to avoid implied amendment or repeal." Finally, United argues that the Insurance Commissioner's Decision is entitled to deference.

### 3. Insurance Commissioner's arguments

The Insurance Commissioner puts forth five arguments in its answering brief. First, the Insurance Commissioner argues that this court lacks jurisdiction to consider the appeal because AlohaCare is not a "person aggrieved" under HRS § 91–14(a). Second, the Insurance Commissioner argues that AlohaCare fails to show that "its substantial rights were prejudiced[,]" and therefore reversal is not warranted under HRS § 91–14(g).[19] Instead, the Insurance Commissioner argues that "[n]othing about any license or other interest of AlohaCare was at issue in the declaratory relief proceedings[,]" since the Decision "was that third party entities [Ohana and United] could perform the services specified in the DHS QExA RFP."

Third, the Insurance Commissioner contends that where, as in this case, the Petition is based on hypothetical or speculative facts, it is within the Commissioner's discretion to deny the Petition pursuant to HAR § 16–

---

18. Ohana joined United's Answering Brief.

19. HRS § 91–14(g) provides:
 Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
 (1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

201–50. The Insurance Commissioner argues that because COL 5, which found that certain allegations in the Petition relied "upon speculative and hypothetical allegations regarding actions which may (or may not) be taken by the Centers for Medicare & Medicaid Services[,]" was unchallenged, the Petition was correctly denied.

Next, the Insurance Commissioner argues that because AlohaCare did not challenge the FOFs and COLs that support the Commissioner's Decision, AlohaCare's "points on appeal" are in contravention of Hawaii Rules of Appellate Procedure (HRAP) 28(b)(4)(C).[20] Finally, the Insurance Commissioner argues that his interpretation and application of the statutes is entitled to deference.

### 4. DHS's arguments

In its answering brief, DHS primarily argues that AlohaCare does not have standing to appeal because it is not an "aggrieved person."[21] DHS also contends that Aloha-Care does not have standing because HRS chapter 432D does not create a private right of action.[22] Third, DHS argues that Aloha-Care does not have standing because, it is not a party or third party beneficiary of the

QExA contract that may, under Hawai'i case law, statute, rule, or regulation, seek a declaration that the contract is " 'null and void' due to alleged 'illegality.' "

DHS next argues that AlohaCare waived its argument that United's and Ohana's lack of HMO licenses disqualified them as successful bidders for the QExA RFP because AlohaCare did not raise this issue in its initial protest of the award to the DHS Director in February 2008, which was subsequently upheld by the Chief Procurement Officer.[23] Finally, DHS argues, without citation to case law or the record, that the Insurance Commissioner should not have conducted a hearing on AlohaCare's Petition because the Insurance Commissioner "should have recognized [AlohaCare's] true purpose" of attempting to "overturn the decision of the Procurement Officer, and evade the exclusive remedy set by the state legislature[ ]" such that any appellate review of that decision is improper.

### 5. AlohaCare's reply briefs

In its reply to DHS's and the Insurance Commissioner's answering briefs,[24] Aloha-

---

**20.** HRAP 28(b)(4) provides that opening briefs shall contain:

> [a] concise statement of the points of error set forth in separately numbered paragraphs. Each point shall state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency. Where applicable, each point shall also include the following:
> . . .
> (C) when the point involves a finding or conclusion of the court or agency, either a quotation of the finding or conclusion urged as error or reference to appended findings and conclusions[.]

**21.** DHS also argues, without citation to case law or the record, that "the decision of the Chief Procurement Officer is now *res judicata,* and AlohaCare is not entitled to relitigate this issue." (Emphasis in original). Because DHS does not present a discernible argument regarding res judicata, we do not address res judicata further. *See, e.g., State v. Mark,* 123 Hawai'i 205, 247, 231 P.3d 478, 520 (2010) (stating that if a party fails to explicitly explain an argument, an appellate court need not address matters as to which the

party has failed to present a discernible argument and the argument may be disregarded).

**22.** Specifically, DHS asserts that no private right of action exists because: 1) AlohaCare is not one of the class for whose especial benefit HRS chapter 432D was enacted; 2) no legislative history evidencing an intent to create the remedy sought by AlohaCare exists; and 3) AlohaCare's remedy of requesting this court to "enforce" the plain meaning of HRS § 432D–2(a) and "decide" that an HMO license is required to conduct the QExA program is inconsistent with the underlying purposes the legislature contemplated when enacting HRS chapter 432D.

AlohaCare did not respond to DHS' argument in its reply brief to the Insurance Commissioner and DHS. As discussed *infra* in note 31, DHS's argument is without merit.

**23.** This argument relates to AlohaCare's challenge to the procurement process, discussed *supra* in note 4. Notably, DHS' current argument contrasts with its position before the hearings officer, to whom DHS asserted that AlohaCare "previously raised the State of Hawaii licensing issue with the State Procurement Officer."

**24.** AlohaCare filed a separate reply to United's answering brief, in which it argued that the HMO Act "comprehensively and exclusively reg-

Care argues that it has standing and that the circuit court had jurisdiction over its appeal because it was aggrieved "as that term is used in HRS § 91–14(a)," and because this court held in *Lingle* that "rulings disposing of declaratory actions have the same status as other agency orders" and are therefore appealable pursuant to HRS § 91–14. In conclusion, AlohaCare asserts that "[t]his [c]ourt has jurisdiction to hear AlohaCare's appeal of the [c]ircuit [c]ourt decision because AlohaCare is an aggrieved party, and, as such, it is afforded the right to appeal by HRS §§ 91–8 and 91–14."

## II. Standards of Review

### A. Standing

 "Whether the circuit court has jurisdiction to hear the plaintiffs' complaint presents a question of law, reviewable de novo. A plaintiff without standing is not entitled to invoke a court's jurisdiction. Thus, the issue of standing is reviewed de novo on appeal." *Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.*, 113 Hawai'i 77, 90, 148 P.3d 1179, 1192 (2006) (citing *Mottl v. Miyahira*, 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001)) (formatting altered).

### B. Secondary judicial review of an administrative decision

 "On secondary judicial review of an administrative decision, Hawaii appellate courts apply the same standard of review as that applied upon primary review by the circuit court." *Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations*, 70 Haw. 72, 80, 762 P.2d 796, 800–01 (1988). For administrative appeals, the applicable standard of review is set forth in HRS § 91–14(g) (2004), which provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Pursuant to HRS § 91–14(g)(5),

> administrative findings of fact are reviewed under the clearly erroneous standard, which requires [the appellate] court to sustain its findings unless the court is left with a firm and definite conviction that a mistake has been made. Administrative conclusions of law, however, are reviewed under the de novo standard inasmuch as they are not binding on an appellate court. Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency. To be granted deference, however, the agency's decision must be consistent with the legislative purpose.

*Peroutka v. Cronin*, 117 Hawai'i 323, 326, 179 P.3d 1050, 1053 (2008) (citations and internal quotation marks omitted).

### C. Statutory interpretation

 "Questions of statutory interpretation are questions of law reviewable de novo." *Gump v. Wal–Mart Stores*, 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000) (formatting altered).

## III. Discussion

As a threshold matter, we hold that AlohaCare has standing to appeal the Insurance Commissioner's Decision. Regarding the merits, we hold that both accident and health insurers and HMOs are authorized pursuant to their licensing schemes to offer the closed panel or limited physician group model of care as required by the QExA contracts. We

---

ulates" entities that "do what licensed HMOs are authorized by that Act ... to do."

conclude that this holding does not nullify the HMO Act.[25] Accordingly, we affirm the judgment of the circuit court.

## A. AlohaCare is a "person aggrieved" and has standing to appeal

AlohaCare brought its petition for declaratory relief as an "interested person" pursuant to HRS § 91–8. HRS § 91–8 allows "[a]ny interested person [to] petition an agency for a declaratory order as to the applicability of any statutory provision or or of any rule or order of the agency." However, HRS § 91–8 does not address the procedures or requirements for the appeal of an agency's declaratory order. Instead, those procedures and requirements are set forth in HRS § 91–14.[26] *See* HRS § 91–14; *Lingle,* 107 Hawai'i at 186, 111 P.3d at 595 (noting that "orders disposing of petitions for declaratory rulings under HRS § 91–8 are appealable to the circuit court pursuant to HRS § 91–14").

■ HRS § 91–14(a) provides that "[a]ny *person aggrieved* by a final decision and order in a *contested case* ... is entitled to judicial review thereof under [chapter 91.]" (Emphasis added). This court has recognized that judicial review of orders disposing of petitions for declaratory rulings pursuant to HRS § 91–8 are also subject to judicial review, although those orders may not result from contested cases. *Lingle,* 107 Hawai'i at 185, 111 P.3d at 594. Put another way, an order disposing of a petition for a declaratory ruling brought pursuant to HRS § 91–8 fulfills the requirement in HRS § 91–14(a) that the decision or order at issue be entered "in a contested case."

In the instant case, it is undisputed that the Insurance Commissioner's Decision did not result from a "contested case." *See* HRS § 91–1(5) (defining a contested case as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing"). Nevertheless, the Insurance Commissioner's Decision was appealable pursuant to HRS § 91–14, because it was an order disposing of a petition brought pursuant to HRS § 91–8. *Lingle,* 107 Hawai'i at 185, 111 P.3d at 594. In addition, as set forth below, Alohacare is a "person aggrieved" by the Insurance Commissioner's Decision, because it faced increased competition from allegedly improperly licensed competitors in the QExA contract process, and the Decision held that AlohaCare's competitors were in fact properly licensed to offer the services required under those contracts. *See* HRS § 91–14(a). Accordingly, AlohaCare has standing to appeal the Insurance Commissioner's Decision.

### 1. AlohaCare is a "person aggrieved" because it suffered an injury-in-fact

■ HRS chapter 91 does not define the term "person aggrieved," but this court has noted that " 'person aggrieved' appears to be essentially synonymous with someone who has suffered 'injury in fact.' " *E & J Lounge Operating Co. v. Liquor Comm'n of the City and Cnty. of Honolulu,* 118 Hawai'i 320, 345 n. 35, 189 P.3d 432, 457 n. 35 (2008) (citation and some quotation marks omitted). Whether a party has suffered an "injury in fact" is determined under a three-part test: "(1) whether the person 'has suffered an actual or threatened injury as a result of the [agency's

---

**25.** The parties disagree whether the Insurance Commissioner's Decision is entitled to deference. "Where an agency is statutorily responsible for carrying out the mandate of a statute which contains broad or ambiguous language, that agency's interpretation and application of the statute is generally accorded judicial deference on appellate review." *Haole v. State,* 111 Hawai'i 144, 150, 140 P.3d 377, 383 (2006) (quoting *Vail v. Emps. Ret. Sys.,* 75 Haw. 42, 59, 856 P.2d 1227, 1237 (1993)). However, "an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is plainly erroneous and inconsistent with both the letter and intent of the statutory mandate." *Id.*

(citing *Kahana Sunset Owners v. County of Maui,* 86 Hawai'i 66, 72, 947 P.2d 378, 384 (1997)). As set forth below, the Insurance Commissioner's analysis is correct. Accordingly, we need not further address whether deference should be accorded.

**26.** We therefore respectfully disagree with the dissent's assertion that AlohaCare may appeal the Insurance Commissioner's Decision "under HRS § 91–8." *See* dissenting opinion at 657–58, 664–65. Moreover, we note that AlohaCare indicated in the circuit court that its appeal was brought pursuant to HRS § 91–14.

decision],' (2) whether 'the injury is fairly traceable to the [agency's decision],' and (3) whether 'a favorable decision would likely provide relief for [the person's] injury.'" *Id.* (some brackets added and some in original) (quoting *Keahole Def. Coal., Inc. v. Bd. of Land & Natural Res.*, 110 Hawai'i 419, 434, 134 P.3d 585, 600 (2006)).

■ In its reply brief, AlohaCare argues that it suffered an "actual or threatened injury" on two grounds. First, AlohaCare agrees with the Insurance Commissioner's determination that AlohaCare was aggrieved because "a finding by the Commissioner that [United] and/or [Ohana] are properly licensed to perform the services required under the QExA contracts in issue ... is effectively a finding that those entities can compete against [AlohaCare] for an award of the QExA contract in issue." Second, AlohaCare contends that its HMO license has been "taken away" or "substantially diminished" by the Insurance Commissioner's Decision.[27] AlohaCare argues that this effect on its license "is not limited to QExA, but applies to any activity which involves arranging for the delivery of health care services."

AlohaCare's argument concerning the effect of the Decision on its other activities is not supported by the record. Neither the record on appeal nor the administrative record on appeal contain any documents, exhibits, or testimony that would establish AlohaCare's possible injury relating to other activities. *See United Pub. Workers, Local 646, AFSCME, AFL–CIO v. Brown*, 80 Hawai'i 376, 380–81, 910 P.2d 147, 151–52 (App.1996) (holding that a union did not have standing because its asserted possible injuries of future "charges" or "civil suits against the Union" that could affect its financial resources were not demonstrated in the record through documents, exhibits or testimony). Accordingly, this injury is not sufficient to establish that AlohaCare is a "person aggrieved[.]"

However, as noted by the Insurance Commissioner, AlohaCare was "adversely affected" by the Decision "with respect to the type of license required to offer the QExA plan" because the conclusion that United and Ohana are properly licensed to perform the services required under the QExA contracts "is effectively a finding that those entities can compete against [AlohaCare] for an award of the QExA contract in issue." Accordingly, AlohaCare sustained a concrete injury because it faced increased competition from allegedly improperly licensed competitors in the QExA contract process, and the Decision held that AlohaCare's competitors were in fact properly licensed to offer the services required under those contracts.[28]

In addition, AlohaCare's injury of increased competition by allegedly improperly licensed competitors for the award of the QExA contract is fairly traceable to the Deci-

---

27. AlohaCare's arguments that the Insurance Commissioner's Decision "strips [it] of its license" and that its license was "taken away" are not supported by the record. The Decision did not make a determination regarding AlohaCare's license, revoke AlohaCare's license, or limit AlohaCare's ability to operate an HMO. AlohaCare may still participate in the business it has chosen by "provid[ing] or arrang[ing] for the delivery of basic health care services to enrollees on a prepaid basis," as set forth in HRS § 432D–1.

28. The Insurance Commissioner expressly noted that "determining the validity of the QExA contracts is not the business of insurance and is outside the jurisdiction of the Commissioner." Accordingly, the Insurance Commissioner denied AlohaCare's claims for relief that were "based upon allegations ... regarding the validity of the contracts entered into by DHS with [Ohana] and [United.]"

We agree with the dissent that this conclusion was proper, and that the Insurance Commissioner did not have jurisdiction to declare the contracts null and void or issue a declaration as to whether DHS complied with the provisions of the RFP. *See, e.g.,* dissenting opinion at 659–60. Instead, COLs 7 and 8 noted the proper basis for the Insurance Commissioner's jurisdiction, i.e., that the issue to be decided was whether an HMO license is required to perform the QExA contract and that "this matter involves interpretation of HRS §§ 431:1–201, 431:1–205, and HRS [c]hapters 432D, 432E and 431:10A." *See* HAR 16–201–2 (1990) (defining "declaratory relief" as "the authority's declaration as to the applicability or nonapplicability with respect to a factual situation of any rule or order of the authority or *of a statute which the authority is required to administer or enforce*") (emphasis added); HRS § 431:2–201(b) (2005) (providing that the Insurance Commissioner "shall enforce" the Insurance Code, HRS chapter 431).

sion, see E & J Lounge, 118 Hawai'i at 346 n. 35, 189 P.3d at 458 n. 35, because the Decision held that United and Ohana were properly licensed to perform the services required under the QExA contracts.[29]

Finally, a favorable decision would provide AlohaCare relief from its injury. See E & J Lounge, 118 Hawai'i at 345 n. 35, 189 P.3d at 457 n. 35. If this court were to find that an HMO license is necessary to offer the services required under the QExA contracts, AlohaCare would be relieved of competition from United and Ohana in bidding for such contracts, unless United and Ohana obtained an HMO license.[30]

Based on the foregoing, AlohaCare is a "person aggrieved" that has standing to appeal pursuant to HRS § 91–14(a).[31]

### 2. We need not resolve whether an "interested person" may appeal an order entered on a petition brought pursuant to HRS § 91–8

Because we conclude that AlohaCare is a "person aggrieved," we need not resolve whether, as asserted by the dissent, Aloha-Care had standing to appeal the Decision as an "interested person." See Richard v. Metcalf, 82 Hawai'i 249, 254, 921 P.2d 169, 174 (1996) (listing, "in order from the broadest to the narrowest category, the respective classes of potential litigants under HRS chapters 91 and 92" as "any person," "any interested person," and "persons aggrieved . . . in a contested case") (citations and footnote omitted). Moreover, we note that AlohaCare has not argued that it has standing to appeal the Insurance Commissioner's Decision as an "interested person."[32] Finally, we note that the cases cited by the dissent, see dissenting opinion at 657–58, do not resolve, either expressly or impliedly, whether an "interested person" may appeal a declaratory order that did not result from a contested case.

For example, in Lingle, this court addressed whether the circuit court had jurisdiction, pursuant to HRS § 91–14, to review an agency's refusal to issue a declaratory order. 107 Hawai'i at 184–86, 111 P.3d at 593–95. The petitioners argued that the circuit court did not have jurisdiction because the order "did not result from a contested case." Id. at 183, 111 P.3d at 592. This court noted that it had "consistently recognized that circuit courts have jurisdiction, pursuant to HRS § 91–14, to review orders disposing of petitions for declaratory rulings." Id. at 185, 111 P.3d at 594 (citations omitted). This court explained that, pursuant to HRS § 91–8, "[o]rders disposing of

---

**29.** DHS contends that AlohaCare's injury is not traceable to the Decision because it was DHS, rather than the Insurance Commissioner, who selected United's and Ohana's bids over Aloha-Care's bid. DHS further contends that even if the Decision had been adverse to United and Ohana, AlohaCare would not have been awarded the contract because AlohaCare's bid proposal was rejected for not meeting the technical requirements of the RFP. However, DHS's arguments rest on the assumption that AlohaCare's injury was not being awarded a QExA contract. Instead, as noted above, AlohaCare's injury was facing increased competition by allegedly improperly licensed competitors in the QExA RFP process. This injury is fairly traceable to the Decision.

**30.** Although the Insurance Commissioner was without jurisdiction to void the contracts, it is possible that such a decision might eventually result in the voiding of the contracts by DHS. In that regard, DHS argues that "AlohaCare would not attempt to bid on any new RFP (if it was issued)" because AlohaCare challenged the procurement process and therefore "has already tak-

en the position that QExA is itself 'illegal[.]'" However, DHS's contention regarding Aloha-Care's unwillingness to bid on a subsequent RFP is without support in the record.

**31.** We further conclude that DHS's argument that HRS chapter 432D does not provide for a private cause of action is without merit. Aloha-Care had a right to bring its petition for declaratory relief pursuant to HRS § 91–8 and HAR § 16–201–50 as an "interested person." Because AlohaCare was aggrieved by the Decision, Aloha-Care had the right to appeal the Decision through the procedures set forth in HRS § 91–14(a).

**32.** AlohaCare argued in the circuit court that, pursuant to Lingle, a HRS § 91–8 order disposing of a declaratory petition is appealable pursuant to HRS § 91–14. However, AlohaCare further argued that it was "aggrieved" by the Insurance Commissioner's Decision, and it did not argue that it could appeal without being aggrieved. AlohaCare continues to argue on appeal that it has standing because it is aggrieved by the Decision.

petitions [for declaratory rulings] shall have the same status as other agency orders[,]" and that the phrase "other agency orders" was intended to "permit review of petitions for declaratory relief." *Id.* (some brackets in original and some added). Relying on legislative history, this court determined that the refusal to issue a declaratory order "in itself would be an agency order," and therefore would be reviewable. *Id.* Accordingly, this court held that the circuit court had jurisdiction over the agency appeal. *Id.* at 186, 111 P.3d at 595.

However, it does not appear that any of the parties in *Lingle* contested the appellants' standing to appeal,[33] and the basis for the appellants' standing, i.e., the question of whether an appellant must be "aggrieved" or merely "interested" to appeal a declaratory order, was not addressed. *Id.* at 184–86, 111 P.3d at 593–95; *see also Vail v. Emps. Ret. Sys.*, 75 Haw. 42, 47, 52–66, 856 P.2d 1227, 1231, 1233–1240 (1993) (addressing an appeal of an agency's declaratory order on the merits, where the appellant's standing to seek judicial review was neither challenged nor discussed); *Kim v. Emps. Ret. Sys.*, 89 Hawai'i 70, 73, 75–76, 968 P.2d 1081, 1084, 1086–87 (App.1998) (same). Thus, we respectfully disagree with the dissent's conclusion that this court has "impliedly determined" that a party appealing a declaratory order need not be aggrieved. Dissenting opinion at 657. While *Lingle* and the cases cited therein determined that a declaratory order is ap-

pealable, those cases did not determine by whom such an order may be appealed.[34]

Accordingly, we respectfully decline to resolve whether AlohaCare had standing to appeal as an "interested person," and hold that AlohaCare had standing as a "person aggrieved." [35]

**B. Both accident and health insurers and HMOs are authorized to provide the closed panel plan required by the QExA contracts**

In COL 16, the Insurance Commissioner identified a "substantial overlap between the powers granted to health maintenance organizations under HRS Chapter 432D and entities licensed under HRS [article] 431:10A." The Insurance Commissioner went on to state that a

> key distinction is that HMOs are the only licensed entities that may furnish health care directly to their members through facilities that it owns or operates and utilizing the services of physicians employed by the HMO and require that coverage is only provided when a member either utilizes its facilities and providers or is specifically authorized by its providers to utilize outside facilities or providers. *An entity licensed as an HMO is not limited to furnishing care directly to its members through its owned facilities and employed providers, but it is authorized to do so. That authorization distinguishes entities*

---

33. "[T]he standing inquiry focuses on whether a *particular* private party is an appropriate plaintiff." *Cnty. of Hawai'i v. Ala Loop Homeowners,* 123 Hawai'i 391, 406 n. 20, 235 P.3d 1103, 1118 n. 20 (2010) (emphasis in original) (citation omitted).

34. Similarly, the legislative history of HRS chapter 91, the Hawai'i Administrative Procedures Act (HAPA), indicates that one of the "basic purposes" of the HAPA was "[t]o provide for judicial review of agency decisions[.]" H. Stand. Comm. Rep. No. 8, in 1961 House Journal at 655. However, this broad statement of purpose does not clarify the legislature's intent with regard to standing, and does not evidence an intent to impose a lower standing threshold for appeals of declaratory orders than of orders in contested cases.

35. We respectfully disagree with the dissent's assertion that we have "erect[ed] barriers to re-

view the declaratory orders entered under HRS § 91–8" by declining to resolve this issue. Dissenting opinion at 649. To the contrary, we recognize that orders entered pursuant to HRS § 91–8 are appealable pursuant to HRS § 91–14, *see Lingle,* 107 Hawai'i at 183, 111 P.3d at 592, and hold that AlohaCare had standing to challenge the order at issue in the instant case.

We also respectfully disagree with the dissent's assertion that we have imposed a "new, substantive requirement" on appeals of HRS § 91–8 orders. Dissenting opinion at 664. The requirement that an administrative appeal be brought by a "person aggrieved" is set forth in HRS § 91–14. The cases cited by the dissent do not alter this requirement. *See Lingle,* 107 Hawai'i at 184–86, 111 P.3d at 593–95; *Vail,* 75 Haw. at 47, 52–66, 856 P.2d at 1231, 1233–1240; *Kim,* 89 Hawai'i at 73, 75–76, 968 P.2d at 1084, 1086–87.

*licensed as HMOs from other risk-bearing entities licensed by the Insurance Commissioner in the State of Hawaii.* Conversely, risk bearing entities licensed under HRS [article] 431:10A are prohibited from requiring that "service[s] be rendered by a particular hospital or person." HRS § 431:10A–205(b).

(Emphasis added).

AlohaCare argues that the two statutory provisions do not overlap and the Insurance Commissioner's interpretation of HRS 431:10A–205(b) "effectively [ ] repealed [the HMO Act] by administrative fiat."

As set forth below, HRS chapter 432D and HRS article 431:10A authorize both HMOs and accident and health insurers to provide the closed panel product envisioned by the QExA program. Moreover, this interpretation of the statutory schemes does not nullify the HMO Act.

### 1. The HMO Act and HRS article 431:10A authorize HMOs and accident and health insurers to provide closed panel products

■ This court must determine whether both HRS chapter 432D and HRS article 431:10A authorize the provision of health care services as required by the QExA contracts.[36] Initially, we note that the RFP appears to contemplate that both HMOs and accident and health insurers could provide the closed panel product required by the QExA RFP.[37] Nevertheless, the question for decision here is whether, under Hawaii's insurance code, accident and health insurers are authorized to provide that product.

There is no dispute that the HMO Act authorizes HMOs to provide or arrange for the services required under the QExA contracts. The plain language of HRS § 432D–1 indicates that HMOs are authorized to "provide or arrange for the delivery of basic health care services to enrollees on a prepaid basis, except for enrollee responsibility for copayments, deductibles or both." "[B]asic health care services" are defined in HRS § 432D–1 as "preventive care, emergency care, inpatient and outpatient hospital and physician care, diagnostic laboratory services, and diagnostic and therapeutic radiological services." Applying those definitions to the instant case, it is clear that properly licensed HMOs, like AlohaCare, are authorized pursuant to HRS § 432D–1 to "provide or arrange[,]" at their option, for the closed panel health care services required under the QExA program. Although the QExA RFP did not define "healthcare services[,]" the foregoing definitions appear to coincide with HMOs' authorization to provide or arrange for "preventive care, emergency care, inpatient and outpatient hospital and physician care, diagnostic laboratory services, and diagnostic and therapeutic radiological services." *See* HRS § 432D–1. Therefore, HRS § 432D authorizes HMOs to provide or arrange for the closed panel services required under the QExA RFP.

The plain language of HRS § 431:10A–205(b), on the other hand, is not as clear as HRS chapter 432D regarding whether the statute authorizes accident and health insurers to offer the closed panel product required by the QExA contracts, because the statute prohibits a risk-bearing entity licensed as an accident and health insurer from requiring that medical services be rendered by "a par-

---

**36.** As noted in COL 9, the QExA program also is "governed by federal law relating to the Medicaid program." No party disputes the Insurance Commissioner's finding that the "Social Security Act § 1903(m) and federal regulation at 42 C.F.R. § 438.116(b)(1) expressly state that a Medicaid managed care organization [ ] may be either a federally qualified HMO or 'be licensed or certified by [Hawaiʻi] as a risk bearing entity.' " Accordingly, we will not address federal law further.

**37.** The RFP did not specifically require that an entity seeking to perform the QExA contract be licensed as an HMO, but stated that providing

"health plans" must be "qualified and properly licensed[.]" The RFP also provided that "[t]he health plan shall be properly licensed as a health plan in the State of Hawaii (See Chapters 431, and 432, and 432D HRS)." The RFP defined "health plan" as "[a]ny healthcare organization, insurance company or health maintenance organization, which provides covered services on a risk basis to members in exchange for capitation payments." It thus appears that both "qualified and properly licensed" HMOs and insurers would be eligible to provide the QExA closed panel services under the terms of the RFP.

ticular hospital or person." The plain language of HRS § 431:10A–205(b) is written in the singular, indicating that insurers may not require that services be rendered by a single "hospital or person." Accordingly, it appears that HRS § 431:10A–205(b) would allow accident and health insurers like United and Ohana to provide the QExA closed panel product because the RFP required that "enhanced quality healthcare services" be obtained from a network of providers and not a single "hospital or person." *See* HRS § 431:10A–205(b).

Nevertheless, the use of singular language is not determinative. *Nobriga v. Raybestos–Manhattan, Inc.*, 67 Haw. 157, 163, 683 P.2d 389, 394 (1984) ("The use of words in a statute signifying the singular is ... not conclusive."). HRS § 1–17 sets forth the general rule of statutory construction that "[w]ords ... in the singular or plural number signify both the singular and plural number[.]" HRS § 1–17 (1993). This provision suggests that HRS § 431:10A–205(b) would not simply prohibit an accident and health insurer from requiring that services be rendered by "a particular hospital or person," but also by "particular hospitals or persons." If HRS § 431:10A–205(b) prohibits accident and health insurers from providing services by "particular hospitals or persons[,]" United and Ohana would not be able to provide the closed panel product required under the QExA contracts with their accident and health insurance licenses because the RFP required that services be rendered by a designated "provider network[.]"

This court has interpreted statutes using the statutory presumption in HRS § 1–17 only after reviewing the legislative history and context in which a statute was passed to determine whether the legislature intended to signify both the singular and plural forms of a word. *See Nobriga*, 67 Haw. at 163, 683 P.2d at 394 (looking to the legislative objective of HRS § 663–14 to determine that the

legislature did not intend for there to be a different result based on whether the singular or plural form of the phrase "one joint tortfeasor" and the word "release" was used in the Uniform Contribution Among Joint Tortfeasors Act); *see Wong v. Hawaiian Scenic Tours, Ltd.*, 64 Haw. 401, 403–05, 642 P.2d 930, 932–33 (1982) (per curiam) (reviewing the relevant legislative history and applying HRS § 1–17 to the term "person" to mean "persons" in a comparative negligence statute). Therefore, this court must look to legislative history to determine whether the legislature intended for HRS § 431:10A–205(b) to prohibit an accident and health insurer from requiring that services be rendered both by "a particular hospital or person," and also by "particular hospitals or persons."

The legislative history of HRS § 431:10A–205(b) is silent on whether accident and health insurers are prohibited from requiring that services be rendered by "particular hospitals or persons." *See, e.g.*, S. Stand. Comm. Rep. No. 713, in 1955 Senate Journal, at 668. The legislative history also is silent regarding whether the statute precludes accident and health insurers from offering a closed panel product, such as required by the QExA program. *See id.* Nevertheless, because of the historical context in which HRS § 431:10A–205(b) developed, it appears that the legislature did not intend to prohibit accident and health insurers from requiring that services be rendered by "particular hospitals or persons" when it adopted HRS § 431:10A–205(b). Although HRS § 431:10A–205(b) was enacted in 1987, the statute has remained virtually unchanged since 1955, when it was originally codified as Revised Laws of Hawai'i (RLH) § 181–55(b).[38] The text of HRS § 431:10A–205(b) also "substantially conforms" to a model law proposed by the National Association of Insurance Commissioners. *See* Digest of Bills Passed, 14th Legislature, Regular Session of

---

**38.** RLH § 181–55(b) provided:

Any group or blanket disability policy may provide that all or any portion of any indemnities provided by any such policy on account of hospital, nursing, medical, or surgical services may, at the insurer's option, be paid directly to the hospital or person rendering such services,

*but the policy may not require that the service be rendered by a particular hospital or person.* Payment so made shall discharge the insurer's option the insurer's obligation with respect to the amount so paid.

(Emphasis added).

1987, p. 374–75. Closed panel plans, however, became popular only more recently and were unlikely to have been discussed in 1955, when the language of HRS § 431:10A–205(b) was first drafted. *See, e.g., Nw. Med. Labs., Inc. v. Blue Cross and Blue Shield of Oregon, Inc.*, 310 Or. 72, 794 P.2d 428, 432 n. 2 (1990) (citation omitted) (stating that in 1973, Congress enacted the federal HMO Act, 42 USC § 300(e), which specifically authorized "closed panel" HMOs).

Other jurisdictions have interpreted the phrase "particular hospital or person" in similar statutes to mean a single "hospital or person" and not "hospitals or persons[.]" In *Insurance Commissioners v. Mutual Medical Insurance, Inc.*, 251 Ind. 296, 241 N.E.2d 56, 60–61 (1968), *superceded by statute on other grounds as held in Huffman v. Office of Envtl. Adjudication*, 811 N.E.2d 806, 811–12 (Ind.2004), the Indiana Supreme Court looked to the intent of the Indiana legislature when it required, "as a basic provision of individual and group accident and sickness policies, that 'the policy may not require that the service be rendered by a particular hospital or person[.]' " In that case, the "Appellant–Commissioner contend[ed] that this language reflects the legislative intent that no policy defeat an insured's right of recovery for medical services covered in the policy when the services are rendered by a person duly qualified in Indiana to perform them." *Id.* The case arose after insurers, under the applicable insurance laws of Indiana, allegedly did not compensate podiatrists for the performance of podiatry services because the podiatrists did not hold unlimited licenses to practice medicine in Indiana. *Id.* at 57–58. The Indiana Supreme Court held:

> It is our opinion that *the language relied on* by the appellants before the Commissioner *is statutory language of differentiation,* by which policy designs that would permit the insurer to direct the destiny of the cure through the specific designation of the person or facilities, are prohibited. *The phrase 'may not require that the service be rendered by a particular hospital or person' distinguishes accident and sickness policy standards from the standards of the Workmens' Compensation Laws, which expressly permit and authorize an*

*employer to select for the treatment of his employee, specific physicians, hospitals, nurses, or spiritual healers.* Burns' Indiana Statutes, Anno., (1965 Repl.), s[sic] 40–1225. Therefore, Burns' ss [sic] 39–4253 and 39–4260 (supra) serve to prohibit this selective and discretionary designation of personnel for the treatment of the ill, rather than to affirmatively require insurers to indemnify for all attempted cures which are legally rendered.

*Id.* at 61 (emphasis added).

The same statutory language also was at issue in *Herring v. American Bankers Insurance Co.*, 216 So.2d 137 (La.App.1969). In *Herring*, the Court of Appeal of Louisiana considered whether an insurance policy provision that benefits would be paid for confinement only in hospitals recognized by any of three medical associations violated a Louisiana statute providing that such insurance policies may not require that services be rendered by "a particular hospital or person." *Id.* at 138–39. The Court of Appeal held:

> We do not construe the provision requiring treatment by a hospital recognized by at least one of the associations named in the policy as naming a particular hospital. The statute is not intended to prevent a provision in a policy requiring an institution to meet certain standards before it may be classed as a hospital within the meaning of the policy. We believe that the intent of the statute in prohibiting the naming of a particular hospital has reference to the specification in the policy that an insured must go to a certain hospital designated in the contract by its trade name. We do not believe that the statute intended to prohibit a contract containing a provision prescribing a quality or status which an institution must possess before it will be included under the definition of an acceptable hospital within the terms of the policy. *The statute, we feel, was intended to prevent any practice of favoritism between an insurance company and some particular hospital or institution.* This is not the situation in the case under consideration.

*Id.* at 140 (emphasis added).

Similar to the provision at issue in *Herring*, the QExA RFP did not require that

QExA members go to a "particular hospital or person" to receive health care. Instead, the QExA RFP required that members receive services in the QExA network, and if medically necessary covered services were not available in the network or on the island of residence, that the member be provided services out-of-network or transported to another island to access the services. The analyses in *Mutual Medical Insurance* and *Herring* support the conclusion that HRS § 431:10A–205(b) only applies to a single "particular hospital or person," and that the statute should be read without resorting to HRS § 1–17.

Moreover, prohibiting accident and health insurers from requiring that services be rendered by particular "hospitals or persons" would be inconsistent with the ability of those insurers to offer "managed care plan[s,]" as recognized under HRS § 432E–1.[39] HRS § 432E–1 was enacted in 1998—43 years after the "particular hospital or person" provision in HRS § 431:10A–205(b) was first codified—and recognized that authorized insurers may provide "for the financing or delivery of health care services or benefits to enrollees through ... [a]rrangements with selected providers or provider networks to furnish health care services or benefits." Prohibiting accident and health insurers from requiring that services be rendered by particular "hospitals or persons" would conflict with the recognition of authority in HRS § 432E–1, thereby repealing a portion of the later-enacted statute. *See G. ex rel. K. v. State Dep't of Human Servs.*, 676 F.Supp.2d 1046, 1081 (D.Haw.2009).[40]

Such a result would violate two rules of statutory construction. First, "[t]he general rule is that repeals by implication are not favored and that if effect can reasonably be given to two statutes, it is proper to presume that the earlier statute is to remain in force and that the later statute did not repeal it." *State v. Pacariem*, 67 Haw. 46, 47, 677 P.2d 463, 465 (1984) (quoting *State v. Gustafson*, 54 Haw. 519, 521, 511 P.2d 161, 162 (1973) (per curiam)); *see also Richardson v. City & Cnty. of Honolulu*, 76 Hawai'i 46, 55, 868 P.2d 1193, 1202 (1994) (quoting *Mahiai v. Suwa*, 69 Haw. 349, 356–57, 742 P.2d 359, 366 (1987))(stating that "where there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored. However, where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored[ ]"). Second, "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993). Here, it is possible to give effect to HRS § 431:10A–205(b) and HRS § 432E–1

---

39. The Patients' Bill of Rights Act, HRS § 432E–1, defines a "[m]anaged care plan" as:

> *any plan*, regardless of form, *offered or administered by any person or entity, including but not limited to an insurer governed by chapter 431*, a mutual benefit society governed by chapter 432, a health maintenance organization governed by chapter 432D, a preferred provider organization, a point of service organization, a health insurance issuer, a fiscal intermediary, a payor, a prepaid health care plan, and any other mixed model, *that provides for the financing or delivery of health care services or benefits to enrollees* through:
> (1) *Arrangements with selected providers or provider networks to furnish health care services or benefits;* and
> (2) Financial incentives for enrollees to use participating providers and procedures provided by a plan;
> provided, that for the purposes of this chapter, an employee benefit plan shall not be deemed a managed care plan with respect to any provision of this chapter or to any requirement or rule imposed or permitted by this chapter which is superseded or preempted by federal law.

HRS § 432E–1. (Emphasis added).

40. The district court in *G. ex rel. K.* addressed the same facts at issue in the instant case and also found that HRS § 431:10A–205(b) should not be read in light of HRS § 1–17 because "such a construction would be inconsistent with the legislative intent expressed in a later-enacted statute, HRS § 432E–1." 676 F.Supp.2d at 1081, n. 24. Although the decisions of federal courts on matters of state law are not dispositive, they can be persuasive. *Cf. Arquero v. Hilton Hawaiian Joint Venture LLC*, 104 Hawai'i 423, 429–30, 91 P.3d 505, 511–12 (2004) (stating that the federal courts' interpretation of Title VII of the Civil Rights Act of 1964 is "persuasive, but not controlling" when interpreting analogous Hawai'i state laws).

by reading the former statute in the singular, thereby avoiding repeal by implication.

▉ Accordingly, both HMOs and accident and health insurers are authorized to arrange for medical services for members using a defined network of providers, i.e., particular "hospitals or persons." HRS § 432D–1; HRS § 431:1–201(a). We note, however, that only an HMO is authorized to arrange for services to be rendered by a single "hospital or person." In addition, an HMO, unlike an accident and health insurer, may "provide" "for the delivery of basic health care services" in facilities it owns or operates utilizing the services of physicians employed by the HMO. *See* HRS § 432D–1.

Based on the foregoing, HRS article 431:10A and chapter 432D authorize accident and health insurers and HMOs, as riskbearing entities, to provide the closed panel product required by the QExA contracts.

## 2. Allowing accident and health insurers to provide closed panel products does not nullify the HMO Act

AlohaCare contends that, by allowing accident and health insurers to provide a closed panel product, the Decision authorized these insurers to "operate an HMO" in violation of HRS chapter 432D. AlohaCare presents two arguments in support of its position: 1) the HMO Act unambiguously provides that no person[41] shall operate a health maintenance organization without a license, and providing services pursuant to the QExA contracts requires an HMO license; and 2) the legislature intended for the HMO Act to occupy the " 'field' of activities to which the [HMO] Act applie[s] (and for which it require[s] a license)" thereby prohibiting other risk-bearing entities from engaging in activities authorized by HRS chapter 432D. For the reasons set forth below, AlohaCare's arguments are meritless.

### a. The HMO Act is ambiguous and cannot be construed literally without repealing HRS § 432E–1

▉ AlohaCare contends that the Insurance Commissioner improperly departed from the broad, literal meaning of the phrase "operate a health maintenance organization" in HRS § 432D–2(a). HRS § 432D–2(a) provides, in pertinent part: "No person *shall* establish or *operate a health maintenance organization* in this State without obtaining a certificate of authority under this chapter." HRS § 432D–2(a) (emphasis added).

AlohaCare contends that the words "shall"[42] and "operate" in HRS § 432D–2(a) are not ambiguous and indicate that the HMO Act preempts the field of activities to which the HMO Act applies. Moreover, even if the terms are ambiguous, AlohaCare contends that the "proper course of action is to look to a dictionary to determine the ordinary meaning[s,]" which confirm that the HMO Act preempts the field of activities to which it applies.

As set forth below, the language of HRS § 432D–2(a) is not clear and unambiguous. Moreover, a literal interpretation would have the effect of repealing a portion of HRS § 432E–1, which was enacted three years after the HMO Act.

The HMO Act does not define the word "operate" or what it means to "operate a health maintenance organization[.]" See HRS § 432D–1. An HMO, however, is defined pursuant to HRS § 432D–1 as "any person that undertakes to *provide* or *arrange* for the delivery of basic health care services to enrollees on a prepaid basis, except for enrollee responsibility for copayments, deductibles, or both." (Emphasis added).

▉ It is true that "when a term is not statutorily defined, this court may resort to

---

**41.** For the purposes of HRS chapter 432D, "[p]erson" is defined as "any natural or artificial person including by not limited to individuals, partnerships, associations, trusts, or corporations." HRS § 432D–1.

**42.** No party disputes that the term "shall" in HRS § 432D–2(a) is mandatory, as opposed to discretionary. *See Clark v. Arakaki*, 118 Hawai'i

355, 370, 191 P.3d 176, 191 (2008) (defining the word "shall" according to *Blacks's Law Dictionary* as mandatory); *Blacks's Law Dictionary* 1499 (9th ed. 2009) (defining the word "shall" as "[h]as a duty to; more broadly, is required to.... This is the mandatory sense that drafters typically intend and that courts typically uphold[ ]"). Accordingly, we will not address this argument further.

legal or other well accepted dictionaries as one way to determine its ordinary meaning." *Estate of Roxas v. Marcos,* 121 Hawai'i 59, 66, 214 P.3d 598, 605 (2009) (internal quotation marks and citation omitted). "Operate" is defined in the sixth edition of Black's Law Dictionary as "[t]o perform a function, or operation, or produce an effect." *Black's Law Dictionary* 1091 (6th ed. 1990).[43] Webster's Third New International Dictionary similarly defines "operate," as it relates to an entity, as "to manage and put or keep in operation whether with personal effort or not[.]" *Webster's Third New International Dictionary* 1581 (1966). If this court defined "operate" for purposes of HRS § 432D–2(a) according to the dictionaries above, as Aloha-Care requests, any "provi[sion] or arrange[ment] for the delivery of basic health care services[ ]" would require a "certificate of authority under [HRS chapter 432D]."

However, this broad definition conflicts with the conclusion that accident and health insurers, pursuant to HRS article 431:10A, may provide a closed panel product like the one required by the QExA contracts pursuant to their insurance licenses. AlohaCare's proffered definition also conflicts with the plain text of HRS § 432E–1, which recognizes that "managed care plan[s]" (like the one required by the QExA RFP) can be offered or administered by several types of risk-bearing entities licensed by the Insurance Division, including both HMOs licensed under HRS chapter 432D and insurers governed by HRS article 431:10A. *See* HRS § 432E–1. Therefore, if AlohaCare's definition of "operat[ing] a health maintenance organization" is correct, the definition would nullify the portion of HRS § 432E–1 that recognizes that risk-bearing entities other than HMOs are authorized to offer or administer managed care plans.

In the instant case, the Insurance Commissioner properly gave effect to all three relevant statutory schemes, and thereby avoided possible repeal by implication, by defining "operate a health maintenance organization" in HRS § 432D–2(a) as "engaging in activities which only an HMO is authorized to do." *See Pacariem,* 67 Haw. at 47, 677 P.2d at 465 (noting that repeals by implication are disfavored). Under this definition, accident and health insurers licensed pursuant to HRS article 431:10A may still offer managed care plans as recognized in HRS § 432E–1. Accordingly, it is not appropriate to define the word "operate" in HRS § 432D–2(a) in the way suggested by AlohaCare, because to do so would be to ignore the interplay among HRS chapters 432D, 432E and article 431:10A, and would nullify a portion of HRS § 432E–1.

This definition does not nullify the HMO Act—or strip AlohaCare of its HMO license—because HMOs may still "provide or arrange for the delivery of basic health care services" in accordance with HRS § 432D–1. Instead, this definition focuses on a distinguishing feature of HMOs—their authorization to provide or furnish health care directly to their members through facilities they own or operate and utilizing the services of physicians employed by the HMO. *See* HRS §§ 432D–1 and 432D–3(a)(3); *see also G. ex rel. K.,* 676 F.Supp.2d at 1081 n. 24.[44]

**b. Legislative history indicates that the HMO Act was not enacted to preempt the field of managed care regulation**

■ In support of its position that the Decision nullifies the HMO Act, AlohaCare contends that the legislature intended for the HMO Act to occupy the field of activities to which the HMO Act applies, thereby disallowing other risk-bearing entities to engage in activities authorized by HRS chapter 432D. AlohaCare contends that "the legislature was clear in its desire to regulate HMOs because they were not being regulated by any law even though a number were already in business."

However, AlohaCare misstates the applicable legislative history, which conversely indi-

---

43. The ninth, and most recent, edition of *Black's Law Dictionary* does not define "operate." The word "operate" also is not defined in the seventh or eighth editions.

44. HRS § 432D–3(a)(3) provides that HMOs may "[furnish] health care services through providers, provider associations, or agents for providers which are under contract with or employed by the [HMO.]"

352

cates that the HMO Act was not enacted to preempt the field to which it applies. Prior to the HMO Act's enactment in 1995, HMOs were, in fact, regulated by the Department of Labor and Industrial Relations and were not unregulated entities. *See* H. Stand. Comm. Rep. No. 168, in 1995 House Journal, at 1091. Thus, contrary to AlohaCare's assertion, the legislative history does not indicate that the act was passed to "fill a regulatory void." *See* H. Stand. Comm. Rep. No. 168, in 1995 House Journal, at 1091. Instead, the legislative history repeatedly reveals that the HMO Act was passed in order to monitor the financial soundness of HMOs.[45] See S. Stand. Comm. Rep. No. 1283, in 1995 Senate Journal, at 1309 (stating that "HMOs in Hawaii are not regulated or monitored on a continuing basis *for financial soundness[;]* " "this bill will provide for the *prudent financial regulation* of HMOs that is needed in Hawaii[;]" and that "[t]he purpose of this bill is to provide for the *financial regulation* of [HMOs] in [Hawai'i]") (emphasis added); H. Stand. Comm. Rep. No. 418, in 1995 House Journal, at 1181 (stating that "the purpose of this bill is to authorize the regulation of the *financial soundness* of [HMOs]") (emphasis added); S. Stand. Comm. Rep. No. 884, in 1995 Senate Journal, at 1161 (stating that "[s]upporters [of the bill] were interested in *guarding against insolvencies* in these organizations and protecting the consumers enrolled in these plans from losses[ ]") (emphasis added); H. Stand. Comm. Rep. No. 168, in 1995 House Journal, at 1091 (stating that "[t]he purpose of this bill is to regulate [HMOs], including the establishment of *minimum financial requirements* to ensure the stability of these entities[ ]") (emphasis added).

The underlying purpose of regulating the financial soundness of HMOs is further clarified when it is considered that prior to 1995, health insurance companies and mutual benefit societies, like Hawai'i Medical Services Association, were routinely monitored for financial soundness by the Insurance Division of the DCCA, but HMOs were not. *See* H. Stand. Comm. Rep. No. 168, in House Journal, at 1091.

Because the HMO Act does not cover the field of managed care regulation, and because the relevant statutes can be read together and there is no explicit language or policy reason not to give each statute effect, we do not read the HMO Act as repealing HRS chapter 432E by implication. *Cf. Gardens at West Maui*, 90 Hawai'i at 340–41, 978 P.2d at 778–79 (finding that constitutional provisions and legislative acts covered the whole subject of property taxation power and embraced the entire law in that regard thereby repealing another statute by implication); *see also Gustafson*, 54 Haw. at 520, 511 P.2d at 162 (reading two statutes together recognizing the rule of statutory interpretation avoiding implied amendment or repeal, and holding that a later-enacted statute did not repeal by implication an earlier-enacted statute because there was an "absence of any clear countervailing policy reason to disregard our maxims of statutory construction").

C. **AlohaCare's argument that United and Ohana are "performing their QExA contracts under no licensing authority" is without merit**

■ AlohaCare's argument that United and Ohana are "performing their QExA con-

**45.** Accordingly, AlohaCare's reliance on *Gardens at West Maui Vacation Club v. County of Maui*, 90 Hawai'i 334, 340–41, 978 P.2d 772, 778–79 (1999), for the proposition that the HMO Act "should be given full effect" because the HMO Act was intended to cover the field is misplaced. In *Gardens at West Maui*, this court found that constitutional provisions and legislative acts covered the whole subject of property taxation power and embraced the entire law in that regard thereby repealing another statute by implication. *Id.* In making its determination, this court relied on the text of the constitutional amendment that "expressly and manifestly [was] designed to transfer to the counties broad powers of real

property taxation" and the proceedings of the 1978 constitutional convention, in which it was explicitly noted that "[the] Committee changed this amendment to include the phrase ... in order to clarify the standing committee's intent to grant all taxing powers relating to real property to the counties, except Kalawao.... Your Committee rejected an amendment to return this section to its original language which rests all taxing powers with the State." *Id.* at 341, 978 P.2d at 779. In the instant case, unlike in *Gardens at West Maui*, neither the text of the HMO Act nor the legislative history reveal an intent to cover the whole field.

tracts under no licensing authority" is rooted in COL 4. COL 4 provides:

> The QExA contracts entered into by DHS with [Ohana] and [United] are not contracts of insurance. HRS § 431:1–201(a) provides that *"[i]nsurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies."* Accordingly, determining the validity of the QExA contracts is not the business of insurance and is outside the jurisdiction of the Commissioner. Except for relief in the form of a declaration that neither [United] nor [Ohana] are properly licensed to perform the services required under the QExA contract, all other claims for relief based upon allegations of the Petition regarding the validity of the contracts entered into by DHS with [Ohana] and [United] are denied as beyond the jurisdiction of the authority. HAR § 16–201–50(1)(C).

(Emphasis added).

AlohaCare's contention is based on a multi-step argument. AlohaCare appears to assert that because the Insurance Commissioner concluded that the QExA contracts entered into by DHS with United and Ohana are not contracts of insurance, the services required to be provided by the contracts are not insurance. AlohaCare then appears to contend that because the services under the contracts are not insurance, United and Ohana's insurance licenses pursuant to HRS article 431:10A do not authorize them to perform the services. Therefore, AlohaCare contends that United and Ohana are performing the QExA contracts "under no licensing authority." AlohaCare asserts that the only entity that may perform the services is an HMO, because any "activities" performed by HMOs are, by definition, not insurance.

AlohaCare's interpretation of COL 4 is incorrect. Although the relationship between DHS and the QExA plans is not insurance, the relationship between United and Ohana and their respective QExA members does involve the provision of insurance. *See G. ex rel. K.,* 676 F.Supp.2d at 1081–82. AlohaCare has not appealed the factual bases

underlying COL 4, namely that United and Ohana have agreed to operate a managed care program that provides health care services to QExA members—not DHS—according to the terms of the RFP and as set out by the Insurance Commissioner in his FOFs. Because AlohaCare did not challenge any findings of fact on appeal, the findings of fact are binding on this court. *See 'Ōlelo: The Corp. for Cmnty. Television v. Office of Info. Practices,* 116 Hawai'i 337, 348–49, 173 P.3d 484, 495–96 (2007) ("Findings of fact ... that are not challenged on appeal are binding on the appellate court.") (quoting *Okada Trucking Co., Ltd. v. Bd. of Water Supply,* 97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002)). When the uncontested requirements of the QExA RFP are read alongside the text of HRS § 431:1–201(a),[46] defining the term "insurance," it is clear that United and Ohana have agreed to assume a risk based on a relationship with QExA members—not DHS—and are "undertak[ing] to indemnify another or pay a specified amount upon determinable contingencies." *See* HRS § 431:1–201(a). DHS merely aids in the provision of insurance through the QExA contract. Or, stated differently: "The risk that the companies bear is associated with the coverage they provide to their enrollees-insurance coverage. The State DHS facilitates that insurance by contracting with the plans and paying them for the risks they assume." *G. ex rel. K.,* 676 F.Supp.2d at 1082.

Accordingly, AlohaCare's argument that United and Ohana are "performing their QExA contracts under no licensing authority" is wrong. United and Ohana hold insurance licenses pursuant to HRS article 431:10A and were contracted to provide insurance services for QExA members.

## IV. CONCLUSION

For the foregoing reasons, we affirm the December 28, 2009 judgment of the circuit court.

Concurring and Dissenting Opinion by ACOBA, J.

In my view, (1) an "interested" person, who may judicially appeal a declaratory or-

---

**46.** HRS § 431:1–201(a) (2005) provides that "[i]nsurance is a contract whereby one under-

takes to indemnify another or pay a specified amount upon determinable contingencies."

354

der issued by an agency under Hawai'i Revised Statutes (HRS) § 91–8 (1993),[1] is one who is affected by or involved with any statute, rule, or order under that administrative agency's jurisdiction; (2) Petitioner/ Appellant–Appellant AlohaCare (AlohaCare), as an "interested person," was thus entitled, pursuant to HRS § 91–8, to appeal the order of the Insurance Commissioner (Commissioner) of the Department of Commerce and Consumer Affairs (DCCA) denying AlohaCare's petition for a declaration that under "statutory provision[s]" administered by the DCCA, a Health Maintenance Organization (HMO) license was a necessary requirement for the performance of managed health care services under contracts administered by the Department of Health and Human Services (DHS), to the circuit court of the first circuit (the court); (3) however, AlohaCare had no standing, under HRS § 91–8, to appeal the Commissioner's order with respect to its request that the said contracts awarded to United Healthcare Insurance Company, dba Evercare (United), and Wellcare Health Insurance of Arizona, Inc., dba Ohana Health Plan (Ohana) be declared invalid, but (4) a declaration as to the validity of the contracts could have been cognizable in a court action for declaratory judgment under HRS § 632–1 (1993).

Thus, I concur in upholding the Commissioner's order; however, I disagree with the majority's view that AlohaCare had to be a "person aggrieved" in order to judicially appeal the Commissioner's declaratory order under HRS § 91–8, and that AlohaCare had standing to raise the validity of the award of said contracts in the appeal of the Commis-

sioner's declaratory order. Respectfully, the majority misapplies the meaning of the term "person aggrieved" under HRS § 91–14, which until today meant a party appealing from a decision made in a *contested case* hearing. Under the majority's view, aggrieved person is a status necessary for appealing a *declaratory order,* although that order is not the product of a contested case hearing.

Additionally, the majority interposes an injury-in-fact standing requirement not found in HRS chapter 91 on parties appealing from a declaratory order issued pursuant to HRS § 91–8. The result is that the majority incorrectly decides AlohaCare's objection to United's and Ohana's bids on the merits, thereby exceeding the jurisdiction afforded the Commissioner, the circuit court, and this court in an HRS § 91–8 appeal. In sum, respectfully, the majority erects barriers to review of declaratory orders entered under HRS § 91–8 that did not exist before and were not contemplated under HRS chapter 91.

### I.

The relevant facts of this case, briefly recited, follow. AlohaCare, among other entities, including United and Ohana, responded to a Request for Proposals (RFP) by the DHS inviting qualified and properly licensed health care plans to bid on contracts providing services for the State's Medicaid aged, blind, or disabled members. The RFP was entitled, "QUEST Expanded Access (QExA) Managed Care Plans to Cover Eligible Individuals who are Aged, Blind, or Disabled." [2]

---

1. HRS § 91–8, states as follows:

 **Declaratory rulings by agencies.** Any *interested person* may petition an agency for a declaratory order as to the *applicability* of any statutory provision or of any rule or order of the agency. Each agency shall adopt rules prescribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition. Orders *disposing of petitions in such cases shall have the same status as other agency orders.*

 (Emphases added.)

 HRS § 91–1 (1993) provides that " '[p]ersons' includes individuals, partnerships, corporations, associations, or public or private organizations of any character other than agencies."

2. Pursuant to the Medicaid Act, each state that elects to participate in the Medicaid program must submit a plan to the Centers for Medicare and Medicaid Services, and upon the plan's approval, the state receives a certain amount of federal funding. Although a state's plan is required to conform with federal guidelines to receive funding, in some circumstances compliance may be waived for demonstration projects. *See G. v. Hawaii,* 676 F.Supp.2d 1046, 1052 (D.Haw.2009) (providing a detailed and thorough background of the Medicaid regulations and the history of the proposal process). The State of Hawai'i established a demonstration project, also known as the QExA program, and submitted a waiver application so that it could receive federal funding. The demonstration pro-

In February 2008, the DHS awarded contracts to bidders United and Ohana. AlohaCare, the only bidder with an HMO license, was not awarded a contract.

Approximately two weeks after the contracts were awarded, AlohaCare protested the granting of the contracts to the then-DHS director, Lilian Roller, under HRS § 103F–501 (Supp.2008), which prescribes the procedure for protesting an award of a health and human services contract.[3] On March 12, 2008, Roller upheld the procurement award and dismissed the protest. AlohaCare's request for reconsideration pursuant to HRS § 103F–502 (Supp.2008)[4] was denied. That decision was appealed to the court, which, upon the DHS's motion to dismiss, dismissed the case for lack of "subject matter jurisdiction,"[5] and entered judgment on January 8, 2009. [ROA 08–1–1531 at 225] AlohaCare appealed that decision, and the appeal is currently pending before the Intermediate Court of Appeals (the ICA).[6]

On October 28, 2008, AlohaCare filed a petition for a hearing and for declaratory relief with the Commissioner pursuant to HRS § 91–8 and Hawai'i Administrative Rules (HAR) § 16–201–2,[7] arguing that an HMO license is required for an entity performing the activities called for under the QExA contracts, and, in its memorandum

---

ject was approved. "The QExA Program was intended to provide primary, acute, and long-term care services, including home-and community-based services [to aged, blind, or disabled] beneficiaries using a managed care model." *Id.* at 1052–53. "[U]nder a managed care model, the state contracts with [managed care organizations], which assume the responsibility of providing Medicaid services through their own employees or by contracting with independent providers of such services." *Id.* at 1052.

3. HRS § 103F–501 (Supp.2008) provides, in pertinent part, that "[a] person who is aggrieved by an award of a contract may protest a purchasing agency's failure to follow *procedures established by this chapter, rules adopted by the policy board, or a request for proposals in selecting a provider and awarding a purchase of health and human services contract,* provided the contract was awarded under [HRS § ] 103F–402 or [HRS § ] 103F–403." (Emphasis added). The protest may be resolved by "[t]erminating the contract which was awarded[.]" HRS § 103F–501(c)(2).

4. HRS § 103F–502 states in pertinent part, "A request for reconsideration may be made only to correct a purchasing agency's failure to comply with section 103F–402 or 103F–403, rules adopted to implement the sections, or a request for proposal, if applicable." HRS § 103F–502(b).

5. The court's order did not state its rationale. However, the DHS had filed a motion to dismiss the complaint, and the court granted the DHS's motion to dismiss. The DHS argued in its motion that, although AlohaCare sought judicial review based on, *inter alia,* HRS §§ 103F–501 and 103F–502, those statutes did not vest the court with jurisdiction. Given that a decision resolving a protest award "shall be final and conclusive unless a request for reconsideration is submitted to the chief procurement officer[,]" HRS § 103F–501(e), a decision issued on such a request for reconsideration "shall be final and conclusive[,]" HRS § 103F–502, and "[t]he proce-

dures and remedies provided for in this part, ... shall be the exclusive means available for persons aggrieved in connection with the award of a contract to resolve their concerns[,]" HRS § 103F–504, the DHS maintained that the legislature did not intend for judicial review of such a protest and allowing "legal remedies ... would be inconsistent with the legislature's intent [.]"

6. *But see Alaka'i Na Keiki, Inc. v. Hamamoto,* 125 Hawai'i 200, 206–08, 257 P.3d 213, 219–21 (App.2011) (Since "[t]he Legislature, in enacting Chapter 103F, determined that the judiciary had no power to review procurement grievance procedures under Chapter 103F[,]" the circuit court "did not have the authority to review [the agency's] decision and underlying actions."). Without presaging the accuracy of this decision, the validity of the Commissioner's jurisdiction and licensing requirements would not appear to be expressly abrogated by HRS chapter 103F.

7. HAR § 16–201–2 in pertinent part contains the following definitions:

"Aggrieved person" means any person who shall be adversely affected by an action, decision, order, or rule of the authority or who shall be adversely affected by the action or conduct of any person if the action or conduct is within the authority's jurisdiction to regulate, and shall also include any person who requires the authority's permission to engage in or refrain from engaging in an activity or conduct which is subject to regulation by the authority.

....

"Declaratory relief" means the authority's declaration as to the applicability or non-applicability with respect to a factual situation of any rule or order of the authority or of a statute which the authority is required to administer or enforce.

HAR § 16–201–2 does not define interested party.

accompanying the Petition, stating that "the work to be conducted under [the QExA contracts] is covered only by Hawaii's [HMO] statute [ (HRS chapter 432D) ] and therefore can legally be performed only by entities that hold Hawai'i HMO licenses."

AlohaCare requested that the Commissioner, *inter alia,* (1) declare that Ohana was not a licensed entity in Hawai'i and was therefore ineligible to carry out the duties required under the contract; and (2) issue an order that Ohana cease and desist operations under the contract until it became appropriately licensed.[8] The petition named the Commissioner as the sole respondent.

AlohaCare asserted that it was an "interested party" under HRS § 91–8, and an "aggrieved person" under HAR § 16–201–2 because it was "the only applicant for a contract under the QExA RFP to have an [HMO] license." According to AlohaCare, the Commissioner had authority[9] to act on the petition because the petition concerned "the lack of a required State license, [and] the lack of a valid QExA contract[.]" Finally, AlohaCare urged the Commissioner to end the contractors' "unauthorized insurer and related activities[.]"

The Commissioner allowed United, Ohana, and the DHS to intervene in the proceedings.

8. AlohaCare did not make any explicit allegations concerning United. However, AlohaCare's contention that an HMO license was required under Hawai'i law to perform the QExA contract applied equally to United, which subsequently intervened in the proceedings to argue that an HMO license was not required. Inasmuch as the Commissioner made findings regarding the issue, it can be assumed that the parties implicitly agreed that AlohaCare's arguments applied equally to both United and Ohana.

9. AlohaCare cited HAR § 16–201–1, entitled "Purpose, scope, and construction" which provides in pertinent part:

This chapter is intended to provide uniform rules of administrative procedure to govern all proceedings brought before any *authority* of the department of commerce and consumer affairs, State of Hawai'i, the purpose of which is to obtain:
(1) A determination of any contested or controverted matter within the authority's jurisdiction, through an evidentiary hearing;
(2) *A declaration as to the applicability, with respect to a factual situation, of any rule or order of the authority or of any statute which*

Those entities filed memoranda in opposition to the petition. A hearing was held on March 18, 2009.

On June 2, 2009, the Commissioner issued his decision, findings of fact, conclusions of law, and order, stating that AlohaCare was an interested party with standing to file the petition and an aggrieved person within the meaning of the applicable agency regulations; that the Commissioner did not have authority to determine whether the contracts were valid; and that an HMO license was not required for performance of the QExA contracts:

### CONCLUSIONS OF LAW

1. *[AlohaCare] is an "interested party" and so had standing to file this Petition for declaratory relief pursuant to [HAR] § 16–201–48* [ [10].]

2. *[AlohaCare] is also an "aggrieved person" within the meaning of HAR § 16–201–2, because [it] will be "adversely affected" by a decision of the Commissioner with respect to the type of license required to offer the QExA plan* since a finding by the Commissioner that [United] and/or [Ohana] are properly licensed to perform the services required under the QExA con-

*the authority is required to administer or enforce [.]*
(Emphases added.)
HAR § 16–201–2 defines "authority" as "the director of commerce and consumer affairs, commissioner of securities, *insurance commissioner,* commissioner of financial institutions, and any board or commission attached for administrative purposes to the department of commerce and consumer affairs with rulemaking, decision making, or adjudicatory powers." (Emphasis added.)

10. HAR § 16–201–48 provides:

The department or *any interested person may petition the authority for a declaratory ruling as to the applicability of any statutory provision or of any rule or order adopted by the authority to a factual situation.* Each petition shall state concisely and with particularity the facts giving rise to the petition, including the petitioner's interest, reasons for filing the petition, and the names of any potential respondents, the provision, rule, or order in question, the issues raised, and petitioner's position or contentions with respect thereto.
(Emphasis added.)

tracts in issue ... is effectively a finding that those entities can compete against Petitioner for an award of the QExA contract in issue.

3. HAR § 16–201–50(1)[ [11]] requires that a petition for declaratory relief be denied where "[t]he matter is not within the jurisdiction of the authority" and where "[t]he petition is based on hypothetical or speculative facts of either liability or damages." *Cf. Citizens Against Reckless Development v. Zoning Bd. of Appeals (ZBA)*, 114 Hawaiʻi 184, 194–96, 159 P.3d 143, 153–54 (2007) (explaining that an administrative agency has discretion to deny declaratory relief on a ground enumerated in an agency rule). The Petition raised issues of interpretation of the Hawaiʻi Insurance Code that are within the jurisdiction of the Hawaiʻi Insurance Commissioner to interpret.

4. ... *[D]etermining the validity of the QExA contracts is not the business of insurance and is outside the jurisdiction of the Commissioner. Except for relief in the form of a declaration that neither [United] nor [Ohana] are properly licensed to perform services required under the QExA contract, all other claims for relief based upon allegations of the Petition regarding the validity of the contracts entered into by [the] DHS with [United and Ohana] are denied as beyond the jurisdiction of the authority.* HAR § 16–201–50(1)(C).

. . . .

6. *The issue to be decided in this matter is whether a license issued pursuant to the Health Maintenance Organization Act, HRS Chapter 432D ("the HMO Act") is required to perform the QExA contract.* If so, neither [United] nor [Ohana] are properly licensed to perform the services required under the QExA contracts.

7. *The determination of the issue to be decided in this matter involves interpretation of* HRS §§ 431:1–201, 431:1–205 and HRS Chapters 432D, 432E, and 432:10A. *All of these statutes are within the jurisdiction of the [Commissioner].*

. . . .

29. ... There is no legal basis for concluding that an HMO license is required for [United and Ohana] to offer the QExA plan.

ORDER

. . . .

2. *An HMO license is not required to offer the QExA managed care plan.* The QExA managed care plan may be offered by any risk-bearing entity licensed by the Insurance Division, [DCCA.]

(Emphases added.)

On July 2, 2009, AlohaCare appealed the Commissioner's ruling to the court, pursuant to HRS § 91–1 [12] and HRS § 91–14.[13]

In addition to arguing the merits, the DHS moved to dismiss the suit, contending that AlohaCare lacked standing to appeal the decision because AlohaCare was not an aggrieved person. According to the DHS, Alo-

---

11. HAR § 16–201–50(1) provides:

The authority, as expeditiously as possible after the filing of a petition for declaratory relief, shall: (1) Deny the petition where:
(A) The petition fails to conform substantially with section 16–201–48 or is not supported by a memorandum of law in support of the petition;
(B) The petition is frivolous;
(C) The matter is not within the jurisdiction of the authority;
(D) The petition is based on hypothetical or speculative facts of either liability or damages;
(E) There is a genuine controversy of material fact, the resolution of which is necessary be-

fore any order or declaratory relief may issue; or
(F) There is any other reason justifying denial of the petition.

12. HRS § 91–1 (1993) provides definitions for purposes of HRS chapter 91.

13. HRS § 91–14(a) (Supp.2004) provides, in pertinent part, that *"[a]ny person aggrieved by a final decision and order in a contested case* or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter[.]"* (Emphasis added.)

haCare had not been injured by the Commissioner's decision. Furthermore, in the DHS's view, AlohaCare's alleged "agency appeal[ ]" purportedly was an "attempt to use th[e] [court] to conduct a private action based on alleged violations of [HRS] Chapter 432D." AlohaCare responded that it was aggrieved under HRS § 91-14 because the Commissioner's decision deprived AlohaCare of a contract for which it was the only legally qualified applicant, and amounted to a revocation of AlohaCare's license without due process. In Reply, the DHS countered that "AlohaCare was not awarded the contract for reasons wholly unrelated to the decision of the [Commissioner]." United and Ohana did not file any pleadings with the court on the DHS's motion, but did join the motion.

At the court hearing on September 16, 2009, AlohaCare explained that in the proceedings before the Commissioner, its two bases to gain standing were as an interested party, "a very broad term," and as an aggrieved party, "any person who is required by the—needs the authority's permission, in effect, to do business, i.e. AlohaCare needs the authority of the ... Commissioner to do business." According to AlohaCare, it could appeal the Commissioner's declaratory order because that decision caused injury to "AlohaCare's business *in the future* [.]" (Emphasis added.) "[A]nyone who may be licensed as an indemnity carrier," AlohaCare asserted, "is a now [sic] competitor of AlohaCare who [sic] has a great number of additional burdens that [indemnity carriers] do not have, not the least of which is putting up two million dollars[ [14]] and being subject to numerous regulations[.]" On the other hand, AlohaCare argued that, if the Commissioner or the court ruled that the contract could only be awarded to HMOs, then the contracts let to United and Ohana would be void, and the competition for the contracts would begin again.

The court responded that the argument that the contracts could be declared void should be "set aside" because the contract had "already been awarded." The court inquired if AlohaCare was entitled to bring the

action under HRS § 91-8, which is "intended to interpret law *for the future*[.]" (Emphasis added.) United responded that although a party need only be an interested party to seek a declaratory ruling, "the law has said only that [a] subset of interested persons that are [sic] actually aggrieved that have [sic] sufficient interest in the outcome ... [are] allowed access to the courts in an appeal."

AlohaCare subsequently argued that *Lingle v. HGEA*, 107 Hawai'i 178, 111 P.3d 587 (2005), allowed a judicial appeal of an agency ruling disposing of a declaratory petition. The court issued a minute order, stating that "[t]he court is persuaded on the basis of the rationale in [*Lingle* ] that the court has jurisdiction over this matter[.]" On October 22, 2009, the court issued an order denying the DHS's motion to dismiss for AlohaCare's lack of standing.

As to the merits, the court affirmed the Commissioner's decision. Judgment was entered on December 28, 2009. After filing an appeal, AlohaCare applied for transfer from the Intermediate Court of Appeals to this court, which was accepted.

## II.

AlohaCare raised three points on appeal, essentially contending that the Commissioner erroneously determined that an HMO license is not required for the QExA contracts. The DHS replied, *inter alia*, that AlohaCare was not an "aggrieved person" and, thus, did not have standing to challenge the Commissioner's decision. (Citing *E & J Lounge Operating Co. v. Liquor Comm'n of City & County of Honolulu*, 118 Hawai'i 320, 346 n. 35, 189 P.3d 432, 458 n. 35 (2008) (noting that although HRS § 91-14 does not define a "person aggrieved," such a person appears to be essentially synonymous with someone who has "suffered 'injury in fact.' " (quoting *Ariyoshi v. Haw. Pub. Emp't Relations Bd.*, 5 Haw.App. 533, 540, 704 P.2d 917, 924 (1985)))). *E & J Lounge* explained that, to have suffered an injury in fact, a person must have "suffered an actual or threatened injury

---

**14.** AlohaCare appears to have been referring to the requirement that an entity have an "initial net worth of $2,000,000[,]" HRS § 432D-8, before being awarded an HMO license.

as a result of the defendant's wrongful conduct," which was "fairly traceable to the defendant's actions," and could be relieved by "a favorable decision[.]" *Id.*

According to the DHS, AlohaCare's injury of being an unsuccessful bidder was not "fairly traceable" to the Commissioner's actions because the Commissioner had no involvement in the awarding of the contract and issued his decision after the contract had been awarded. The DHS also maintained that a favorable decision would not provide relief because, whether this court affirmed the agency decision, remanded for further proceedings, or reversed and modified the decision, AlohaCare would not be awarded the QExA contract. Finally, the DHS argued that the Commissioner did not recognize AlohaCare's "true purpose" of attempting to "overturn a decision of the Procurement Officer, and evade the exclusive remedy set by the state legislature[,]" an improper reason to seek a declaratory ruling.

Along the lines of the DHS's argument, the Commissioner maintained that "AlohaCare d[id] not have a sufficient interest in any competitive advantage its HMO license might provide to enable it to resort to the courts ... in an attempt to limit the rights and privileges of other entities holding other categories of licenses issued by the [Commissioner]." In the Commissioner's view, because no legal interest was injured by the decision, AlohaCare lacked standing.[15] United also filed an answering brief, but did not address standing.

AlohaCare submitted two reply briefs, one responding to the jurisdictional arguments raised by the DHS and the Commissioner, and the other addressing the arguments raised by United. In the former, pertinent here, AlohaCare maintained that AlohaCare was an aggrieved party because its HMO "license ... [that] defined and limited who its competition would be has been taken away without due process [by the Commissioner's decision]." Relying on *Lingle,* AlohaCare asserted that the legislature's intent with respect to HRS § 91–8 "stating that rulings disposing of declaratory actions have the same status as other agency orders was to make them appealable to the [court] under HRS § 91–14."

### III.

The Commissioner, the parties,[16] and the majority are incorrect in positing that a party must be "aggrieved" in order to judicially appeal a declaratory decision by an agency, and the court was correct in relying on *Lingle.* HRS § 91–8 provides, in pertinent part, that "*[a]ny interested person may petition an agency for a declaratory order* as to the *applicability* of any statutory provision or of any rule or order of the agency." [17] (Emphases added.) With respect to such orders, HRS § 91–8 mandates that "[o]rders *disposing* of [declaratory] petitions in such cases

---

15. Notably, this position appears inconsistent with the Commissioner's conclusion that AlohaCare was an "aggrieved" person. It is well established that a party will not be permitted to take a position "in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action[,]" *Roxas v. Marcos,* 89 Hawai'i 91, 124, 969 P.2d 1209, 1242 (1998), which would appear to prohibit the Commissioner from arguing that AlohaCare was not aggrieved. However, inasmuch as whether AlohaCare has standing is a question which an appellate court must independently review to ascertain whether jurisdiction exists, the Commissioner's "blowing hot and cold[,]" *id.* (internal quotation marks and citation omitted), on this issue does not affect the analysis of whether jurisdiction existed. *See Ditto v. McCurdy,* 103 Hawai'i 153, 157, 80 P.3d 974, 978 (2003) ("[I]t

is well settled that an appellate court is under an obligation to ensure that it has jurisdiction to hear and determine each case and to dismiss an appeal on its own motion where it concludes it lacks jurisdiction.").

16. AlohaCare maintains that it was both an interested party and an aggrieved party, and its right to appeal was afforded under both HRS §§ 91–8 and 91–4, apparently in response to the argument that "aggrieved" status was necessary to judicially appeal the Commissioner's decision. The argument that AlohaCare had to be "aggrieved," as AlohaCare and the court recognized, was implicitly rejected in *Lingle.*

17. HRS § 91–8 also states that "[e]ach agency shall adopt rules prescribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition."

*shall* [18] *have the same status as other agency* orders." [19] (Emphases added.) For the reasons that follow, inasmuch as HRS § 91–8 agency declaratory orders are accorded the same status as contested case orders that are appealable to a court *by way* of HRS § 91–14, a person who files a petition seeking a declaratory order need only be an "interested" person under HRS § 91–8, and not an aggrieved person, to appeal that order to the circuit court.

### A.

On its face, HRS § 91–8 expressly grants interested persons the right to petition an agency for a declaratory order. HRS chapter 91, the Hawai'i Administrative Procedures Act (HAPA), defines "[p]ersons" broadly, as "including individuals, partnerships, corporations, associations, or public or private *organizations of any character other than agencies.*" HRS § 91–1. However, "interested" is not defined in the HAPA. Thus, "[w]e may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined." *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001) (internal quotation marks and citations omitted). "Interested" is defined as "being affected or involved[.]" *Mer-*

*riam Webster's Collegiate Dictionary* 610 (10th ed. 1993). Based on the plain language of the statute, then, interested persons are those "affected" by, or "involved" with, *id.*, the applicability of "any statutory provision or of any rule or order of the agency[,]" HRS § 91–8.[20]

As set forth in our case law, the applicability of a statutory provision, or rule, or order of an agency may be sought only with respect to an agency action that has not yet been determined. This court has explained that "the legislature acted intentionally when it chose the term 'applicability' to denote a special type of procedure, whereby an interested party could seek agency advice as to how a statute, agency rule, or order would apply to *particular circumstances not yet determined.*" [21] *ZBA*, 114 Hawai'i at 197–98, 159 P.3d at 156–57 (emphasis added).[22] The "[u]se of the declaratory ruling procedural device only makes sense where the applicability of relevant law is *unknown,* either because the agency has not yet acted upon particular factual circumstances, or for some other reason the applicability of some provisions of law have not been brought into consideration." *Id.* at 197, 159 P.3d at 156 (emphasis added). Thus, a declaratory ruling seeks "advance determinations of applica-

---

**18.** *See Dejetley v. Kaho'ohalahala*, 122 Hawai'i 251, 263, 226 P.3d 421, 433 (2010) ("This court has held that 'shall' indicates mandatory language.") (Internal citation omitted.); *see also Gray v. Admin. Dir. of the Court, State of Hawai'i*, 84 Hawai'i 138, 150, 931 P.2d 580, 592 (1997) ("The word 'shall' is generally construed as mandatory in legal acceptation.").

**19.** In near like terms, the applicable agency rule here, HAR § 16–201–48, provides in pertinent part that "any interested person may petition the authority for a declaratory ruling as to the applicability of any statutory provision or of any rule or order adopted by the authority to a factual situation."

**20.** A review of agency rules defining "interested" person shows that "interested" person is defined quite broadly. *See, e.g.,* HAR § 4–42–52 (any "interested party" is "any person having a financial interest in the product involved in an inspection"); HAR § 4–143–3 (with respect to standards for coffee, defining " '[i]nterested party' [as] any person who has a financial interest in the product for which inspection is requested"); HAR § 13–275–2 (with respect to regulations governing procedures for historic preservation of

governmental projects, "interested persons" are "those organizations and individuals that are concerned with the effect of a project on historic properties"); HAR § 16–96–2–1 (defining interested person as any person "with a substantial interest in the outcome of any proceeding conducted by the director").

**21.** Similarly, HAR § 16–201–2 provides that declaratory relief is permissible when the authority can issue a "declaration as to the applicability or non-applicability with respect to a *factual situation* of any rule or order of the authority or of a statute which the authority is required to administer or enforce." HAR § 16–201–2 (emphasis added).

**22.** The legislature acted "intentionally," *ZBA,* 114 Hawai'i at 197–98, 159 P.3d at 156–57, because there are many other ways for an "interested person" to review already-made decisions. For example, an "interested person" may petition for the *"repeal"* of rules, HRS § 91–6, or obtain a judicial declaration on the *"validity"* of any agency rule, HRS § 91–7.

bility, rather than review of already-made agency decisions." *Id.* at 198, 159 P.3d at 157. In other words, applicability denotes an "advance" determination of how a statutory provision, rule, or order may apply to the interested person's "circumstances[.]" *Id.* at 197, 159 P.3d at 156.

Consequently, a person appealing an agency order issued pursuant to HRS § 91–8 must satisfy two requirements. First, the person must be an "interested person." *Cf. RGIS Inventory Specialist v. Haw. Civ. Rights Comm'n,* 104 Hawai'i 158, 162–63, 86 P.3d 449, 452–53 (2004) (holding that agency employee was not an "interested person" and thus did not satisfy the standing requirements of HRS § 91–8). Second, the "interested person" must be seeking an advance determination of whether and in what way some statute, or agency rule, or order applies to the factual situation raised (and must not be seeking review of concrete agency decisions). *ZBA,* 114 Hawai'i at 197, 159 P.3d at 156. An "interested person" is then permitted to appeal the agency's decision utilizing the procedure in HRS § 91–14. *See Lingle,* 107 Hawai'i at 185, 111 P.3d at 594.

## B.

In contrast, an "aggrieved person" is "[a]ny person aggrieved by a final decision and order in a *contested case* " who by virtue of such status is "entitled to judicial review . . . under [HRS chapter 91]." HRS § 91–14 (emphasis added). In appellate review of contested cases generally, "the pertinent inquiry at the outset is whether there was a final decision and order in a contested case from which an appeal could have been taken." *Mahuiki v. Planning Comm'n,* 65 Haw. 506, 513, 654 P.2d 874, 879 (1982). A contested case is defined in HRS § 91–1(5) (1993) as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." Initially, then, "the agency must be required by law to hold a hearing [ [23]] before a decision is rendered." *Lingle,* 107 Hawai'i at 184, 111 P.3d at 593. An agency hearing is required

by law if there is a "statutory, rule-based, or constitutional mandate for a hearing." *E & J Lounge,* 118 Hawai'i at 330, 189 P.3d at 442 (internal quotation marks and citation omitted).

A party must have participated in a contested case hearing in order to subsequently appeal as a "person aggrieved." *See Int'l Bhd. of Painters & Allied Trades, Drywall Tapers, Finishers & Allied Workers v. Befitel,* 104 Hawai'i 275, 88 P.3d 647, 653 (2004)(explaining that, under HRS § 91–14, "[t]o be entitled to judicial review of the [agency] decision, appellees must have participated in a 'contested case' hearing") (internal citation and quotation marks omitted); *Sierra Club v. Haw. Tourism Auth. ex rel. Bd. of Dirs.,* 100 Hawai'i 242, 277, 59 P.3d 877, 912 (2002) (concluding that "[t]he original legislative history of [the Hawai'i Environmental Procedures Act] . . . contemplated that a plaintiff would be considered an 'aggrieved party' with standing [to appeal] only if the party had exhausted available administrative review processes by participating in a contested case hearing, as specified in [HRS chapter 91]" (citing Stand. Comm. Rep. No. 956–74, in 1974 Senate Journal, at 1126–27)); *Alejado v. City & Cnty. of Honolulu,* 89 Hawai'i 221, 226, 971 P.2d 310, 315 (App.1998)("[w]ithout participation in a 'contested case' hearing, a party cannot be 'aggrieved' and therefore has no right to appeal") (internal citation omitted). Thus, to appeal under HRS § 91–14, a party must have participated in a hearing that is mandated by law and that occurs prior to judicial review. *See id.*

## IV.

### A.

Plainly, the legislature drew a distinction between the term "interested person" in HRS § 91–8 and "person aggrieved" in HRS § 91–14. If the legislature had intended that only "persons aggrieved" could appeal a declaratory order, the legislature would have employed that language in HRS § 91–8. *See Jou v. Hamada,* 120 Hawai'i 101, 113, 201

---

**23.** An "agency hearing" is defined as a "hearing held by an agency immediately prior to a judicial review of a contested case as provided in section 91–14." HRS § 91–1(6) (Repl.1993).

P.3d 614, 626 (App.2009) (noting that "the Legislature knows how to definitively eliminate the right to appeal an administrative decision when that is its intent[ ]"). We can "therefore presume that the legislature acted intentionally when it chose the term" *ZBA*, 114 Hawai'i at 197, 159 P.3d at 156, "interested" in designating a status separate and apart from "aggrieved[.]" *Id.* (presuming that the legislature employed the term "applicability" in HRS § 91–8 to denote a "special" procedure to allow an interested part to seek agency advice, given the "panoply of review options available to interested parties, each specified to a different type of agency action"). In specifically employing the term "interested" in the context of declaratory petitions, rather than the term "aggrieved," the legislature established a broader platform for "persons" petitioning for relief under HRS § 91–8 as opposed to HRS § 91–14.

### B.

In the instant case, AlohaCare was an interested person to the extent that it asked whether an HMO license was necessary for the performance of the QExA contracts. In its Petition and memorandum accompanying the Petition, AlohaCare queried whether an HMO license issued under HRS chapter 432D [24] was necessary for performance of a QExA contract. In this regard, AlohaCare satisfied the definition of an interested person. AlohaCare, as an HMO-licensed entity, was "affected by" HRS chapter 432D, a statute under the jurisdiction of the DCCA. *See* HRS § 431:2–101 (establishing the insurance division within the DCCA). AlohaCare "petition[ed] an agency[,]" the DCCA, by its Insurance Commissioner, "for a declaratory order" regarding the "applicability" of the "statutory provision[s]" of HRS chapter 432D to performance of the QExA contracts, pursuant to HRS § 91–8 with respect to, *inter alia*, future contracts.

### V.

### A.

Because AlohaCare was an interested person that sought and received an agency de-claratory order under HRS § 91–8, AlohaCare could judicially appeal that decision under the procedure set forth in HRS § 91–14. HRS § 91–8 provides that "[o]rders disposing of" petitions seeking declaratory rulings *"shall have the same status as other agency orders."* (Emphasis added.) The only "other agency orders" referred to in the HAPA are orders "rendered by an agency in a contested case" under HRS § 91–14. *See Lingle*, 107 Hawai'i at 188, 111 P.3d at 597 (Acoba, J., concurring) (construing statutes in pari materia to provide meaning to the term "other agency orders" in HRS § 91–8). Inasmuch as declaratory orders share "the same status," HRS § 91–8, as contested case orders under HRS § 91–14, "they, like contested case orders [under HRS § 91–14], are subject to judicial review." *Id.* (explaining that declaratory orders are reviewable because they have the same status as contested case orders). Orders disposing of declaratory petitions under HRS § 91–8, then, are independently subject to judicial review and may be appealed pursuant to the judicial review procedure in HRS § 91–14.

### B.

*Lingle* established that an appellant may appeal a declaratory order that "d[id] not result from a contested case[,]" *Lingle*, 107 Hawai'i at 185, 111 P.3d at 594, and, thus, impliedly determined that a person appealing a HRS § 91–8 order need not be a party "aggrieved" as mandated in HRS § 91–14 with respect to "contested cases." Insofar as *Lingle* held that an appellant may appeal a declaratory order because such an order has the same status as a contested case order, and this court exercised jurisdiction, it would appear that an appellant need not be aggrieved to appeal a declaratory order.

Furthermore, if sought, "judicial review of declaratory rulings is statutorily mandated[,]" *id.* at 190 n. 8, 111 P.3d at 599 n. 8 (Acoba, J., concurring), and review is not limited to situations where the order itself

---

**24.** Chapter 432D, titled Health Maintenance Organization Act, sets forth the requirements for establishing and maintaining an HMO, and the powers of an HMO.

causes "aggrievement" or "injury in fact[,]" *E & J Lounge*, 118 Hawai'i at 346 n. 35, 189 P.3d at 458 n. 35. Hence, similar to *Lingle*, although the declaratory order in the instant case did "not result from a contested case[,]" [25] AlohaCare may appeal that decision under HRS § 91–8 because it is an interested person. *See Vail v. Emps. Ret. Sys.*, 75 Haw. 42, 47, 856 P.2d 1227, 1231 (1993) (explaining that the plaintiff had "requested a declaratory order from the agency as to the applicability of HRS § 88–42 to his situation[ ]" of whether he qualified for full-time membership credit in the State of Hawai'i's Employees' Retirement System, and then had filed a complaint for judicial review of the declaratory order in the circuit court using the procedure of HRS § 91–14, without discussing whether the plaintiff was aggrieved); *Kim v. Emps. Ret. Sys.*, 89 Hawai'i 70, 968 P.2d 1081 (App.1998) (reviewing an appeal of a declaratory ruling issued under HRS § 91–8).

### C.

Legislative intent confirms that interested persons may appeal declaratory orders and that such appeals are not limited to aggrieved persons who have suffered an injury in fact. The House Judiciary Committee stated that a "basic purpose" of HAPA was to "*provide for judicial review of agency decisions and orders* on the record[.]" Hse. Stand. Com. Rep. No. 8, in 1961 House Journal, at 655 (emphasis added). Inasmuch as a declaratory petition seeks a "declaratory *order*," HRS § 91–8 (emphasis added), the basic "purpose" of providing for judicial review is implemented by allowing judicial appeals of declaratory orders. *See Lingle*, 107 Hawai'i at 190, 111 P.3d at 599 (Acoba, J., concurring) (noting that the emphasized lan-

guage in the House Judiciary Committee Report "confirms that judicial review was contemplated for declaratory ruling orders").

The Model Act, from which the HAPA is derived, also provides insight with respect to the legislature's intent. The Model Act affords judicial review of declaratory orders, confirming the position that judicial review of declaratory orders is statutorily mandated. The 1946 Model Act "provided for judicial review of . . . declaratory rulings" in stating that "[e]ach agency shall prescribe by rule the form for such petitions and the procedure for their submission, consideration, and disposition." Frank E. Cooper, *State Administrative Law* 241 (1965) (internal quotation marks omitted). Cooper explained that whatever "ruling the agency made," the denial or granting of a declaratory petition "would have the same status as any other final order of the agency[,]" meaning that "the refusal of the agency to make a ruling could be appealed to the courts[,]" or the ruling would be "a matter of formal record" that was appealable. *Id.* at 243.

Judicial review of a declaratory ruling is also supported by Section 204 of the Revised Model State Administrative Procedures Act (MSAPA) (2010). Similar to HRS § 91–8, that section provides that, "[a] person[ [26]] may petition an agency for a declaratory order that *interprets or applies a statute administered by the agency* or states whether or in what manner a rule, guidance document, or *order issued by the agency applies to the petitioner.*" MSAPA § 204(a) (emphases added). Like HRS § 91–8, an agency's declaratory order "has the *same status* and binding effect as an order issued in an adjudication *and is subject to judicial review under Section 501.*" [27] MSAPA § 204(e) (emphases added).

---

25. Here, AlohaCare's petition for a declaratory ruling did not result from a contested case hearing, since the Commissioner had authority to deny the petition without holding a hearing. *See* HAR § 16–201–50 (allowing the Commissioner to exercise discretion when determining whether to deny the petition, set it for argument, or assign it to a hearings officer for further proceedings).

26. Section 102 of MSAPA defines " '[p]erson' [as] an individual, corporation, business trust, statutory trust, estate, trust, partnership, limited

liability company, association, joint venture, public corporation, government or governmental subdivision, agency, or instrumentality, or any other legal or commercial entity."

27. Section 501 entitled, "RIGHT TO JUDICIAL REVIEW; FINAL AGENCY ACTION REVIEWABLE [,]" provides as follows.

(a) In this [article], "final agency action" means an act of an agency which imposes an obligation, grants or denies a right, confers a benefit, or determines a legal relationship as a

Indeed, the commentary to Section 204 of the MSAPA specifically refers to HRS § 91–8, distinguishing "person" from "aggrieved person":

> This section is a revised version of 1961 MSAPA section 8, and 1981 MSAPA Section 2–103 *and Hawai'i Revised Statutes, Section 91–8*. This section embodies a policy of creating a convenient procedural device that will enable parties to obtain reliable advice from an agency.... The term "person" in Subsection (a) is broader than the term aggrieved person for judicial review in Article 5,[28] and is also broader than the term person toward whom agency action is directed in adjudication under Article 4.

(Emphasis added.) Hence, the term "person," referring to one seeking a declaratory order, is intended to be "broader than the term aggrieved person." Commentary to MSAPA § 204. Under section 204(e) of the MSAPA, an agency's declaratory order "is subject to judicial review under Section 501." Thus, the MSAPA supports the view that a person can appeal a declaratory order without having to be aggrieved.

## VI.

### A.

In the instant case, the Commissioner construed AlohaCare's petition as seeking an "advance" determination. The Commissioner stated that he could declare that the QExA contract holders did not have the necessary licenses, but could not hold the contracts void or illegal. The Commissioner also stated that "[t]he issue to be decided is whether ... an [HMO license under] HRS Chapter 432D is required to perform the QExA contract." AlohaCare properly filed a petition seeking clarification of an issue involving "the applicability of" an HMO license issued under HRS chapter 432D to the QExA contract that was "unknown," because "for some ... reason the applicability of [an HMO license] ... ha[d] not been brought into consideration[.]" *ZBA*, 114 Hawai'i at 197, 159 P.3d at 156. Accordingly, the Commissioner could construe AlohaCare's request as seeking a declaratory order of a future nature.

### B.

However, AlohaCare was not an interested person under the declaratory provision of HRS § 91–8 insofar as AlohaCare sought to have the contracts voided.[29] The RFP is not a "statutory provision or [ ] any rule or order," HRS § 91–8, of the DCCA, but instead was issued by the DHS, and, thus, AlohaCare was not "affected by" or involved with any statutory provision, rule, or order under the DCCA's jurisdiction. *Cf. Fasi v. State Public Employment Relations Bd.*, 60 Haw. 436, 442–43, 591 P.2d 113, 117 (1979) (noting that, "[i]n order to fall within the scope of § 91–8, the question presented [in] the petition ha[s] to relate to a statutory provision or a rule or order of the [agency]," and "ha[s] to be one which would be relevant to some action which the [agency] might take in the exercise of the powers granted by [statute]"); *see also* HRS § 103F–501 (stating that a "person who is aggrieved by an award of a contract may protest a purchasing agency's failure to follow procedures established by this chapter, ... or a request for proposals in selecting a

---

result of an administrative proceeding. The term does not include agency action that is a failure to act.

(b) Except to the extent that a statute of this state other than this [act] limits or precludes judicial review, a person that meets the requirements of this [article] is entitled to judicial review of a final agency action.

(c) A person entitled to judicial review under subsection (b) of a final agency action is entitled to judicial review of an agency action that is not final if postponement of judicial review would result in an inadequate remedy or irreparable harm that outweighs the public benefit derived from postponing judicial review.

(d) A court may compel an agency to take action that is unlawfully withheld or unreasonably delayed.

(Brackets in original.)

28. Article 5 discusses the right to judicial review; section 5 states that a person aggrieved or adversely affected by the agency action and one that has standing under the law of the state can seek judicial review of a final agency decision.

29. Although AlohaCare mentioned only Ohana in its petition to the Commissioner, its arguments included United.

provider and awarding a purchase of health and human services contract").

Whether Ohana complied with the RFP was not an issue that the Commissioner could have considered. Since the RFP was not a statutory provision, rule, or order administered by the DCCA, it was outside of his jurisdiction. *See ZBA*, 114 Hawai'i at 200, 159 P.3d at 159 ("Because HRS § 91–8 only allows for declaratory rulings as to questions of 'applicability,' an administrative agency has no discretion to issue rulings under this section that do not bear on such questions."). In this regard, AlohaCare may have been seeking review of an "already-made agency decision[ ][,]" i.e., the DHS's decision to deny AlohaCare's protest, which was an improper use of the declaratory ruling procedure. *Id.* at 197, 159 P.3d at 156.

Moreover, since seeking to "void" the existing QExA contracts did not involve a ruling on the "applicability" of "any statutory provision or of any rule or order of the agency[,]" HRS § 91–8, AlohaCare was not an interested person who properly brought the declaratory petition to the Commissioner with respect to such relief. Consequently, AlohaCare's request for a declaration that the contracts as awarded were void was not an "interpretation" of any "relevant statutes, rules, or orders[,]" *Fasi*, 60 Haw. at 444, 591 P.2d at 118, under the Commissioner's jurisdiction but, instead, a remedy that the Commissioner lacked the power to provide. *Cf.* Commissioner's conclusion (noting that "determining the validity of the QExA contracts is not in the business of insurance and is outside the jurisdiction of the Commissioner[;]" and AlohaCare's claims "based upon allegations … regarding the validity of the contracts entered into by DHS [and United and Ohana] are denied as beyond the jurisdiction of the authority.").

However, to the extent that AlohaCare sought a declaratory order as to whether an HMO license was necessary for QExA contracts, AlohaCare properly sought an "advance determination[ ]" or "agency advice," *ZBA*, 114 Hawai'i at 197–98, 159 P.3d at 156–57, as to how the insurance licensing scheme "would apply to [the] particular circumstances" that had "not yet [been] determined[.]" *Id.* The issue of whether performance under the QExA contracts required an HMO license was an advance determination because that issue had not been decided by the Commissioner up to that point. *Id.* Thus, AlohaCare, as an interested person, could judicially appeal the Commissioner's decision with respect to that declaration. Accordingly, I concur in affirming the court's judgment.[30]

## VII.

However, in my view, AlohaCare could have brought a complaint directly challenging the validity of the specific contracts due to the lack of an HMO license, which would have been cognizable in a court action for declaratory judgment under HRS § 632–1 (1993).[31] HRS § 632–1 provides that declar-

30. As to that part of AlohaCare's appeal that is properly before this court, I agree with the majority's determination that the Commissioner correctly declared that an HMO license is not required for the performance of the QExA contracts. The majority opinion thoroughly reviewed AlohaCare's arguments in this respect.

31. HRS § 632–1 provides as follows:

**Jurisdiction; controversies subject to.** In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for[.] *Controversies involving the interpretation of deeds, wills, other instruments of writing,* *statutes, municipal ordinances, and other governmental regulations, may be so determined,* and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.

Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court *is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary* party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or

atory judgment relief may be granted "where the court is satisfied that antagonistic claims are present between the parties involved[.]" In the instant case, AlohaCare could have sought a declaratory judgment action against United, Ohana, the DHS, and the Commissioner, because there were "antagonistic claims" among AlohaCare, United, and Ohana, based on statutes administered by the Commissioner, concerning the DHS contracts. Although HRS § 632–1 provides that "[w]here ... a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed[,]" that language posed no problem for AlohaCare, inasmuch as, for the reasons discussed *supra*, a declaratory petition before the Commissioner under HRS § 91–8 could not have resulted in the remedy sought by AlohaCare of invalidating the contracts.

Likewise, a protest by AlohaCare before the DHS pursuant to HRS chapter 103F could not obtain the "remedy" of a declaration that the contracts were void because the contract awardees lacked HMO licenses. Ostensibly whether an HMO license is required for the performance of the QExA contracts would not involve the DHS's "failure to follow procedures" under HRS chapter 103, "failure to follow" "rules" adopted by the policy board, or "failure to follow" the "request for proposals", and, thus, AlohaCare could not seek its remedy before the DHS under HRS § 103F–501. *See Dejetley*, 122 Hawai'i at 269, 226 P.3d at 439 (noting that HRS § 632–1 was intended to afford citizens greater relief and, thus, did not appear to preclude the petitioner from bringing a declaratory judgment action, even though quo warranto relief, a common law remedy, was available).

## VIII.

The majority asserts that (1) HRS § 91–14(a) provides for review of "contested cases" and requires that a person be "aggrieved" by

a final decision and order in a contested case to appeal that decision, majority opinion at 637–38; (2) AlohaCare was "aggrieved" by the Commissioner's decision, majority opinion at 637–39; (3) an aggrieved person is one who has suffered an "injury in fact" from the agency decision, majority opinion at 637–38; and (4) AlohaCare is aggrieved, majority opinion at 639. The majority's position on standing seemingly rests on the incorrect premise that the proceeding before the Commissioner was equivalent to a contested case. I must respectfully disagree.

## A.

As to the majority's first assertion, the majority is correct enough that HRS § 91–14(a) provides the means by which judicial review of administrative contested cases can be obtained by an aggrieved person, majority opinion at 637–38. But that is immaterial inasmuch as this is not a contested case, and, thus, AlohaCare need not be an aggrieved party in order to appeal.

The instant case is not a contested case because HRS § 91–8 "do[es] not require the [agency] to hold a hearing prior to issuing a ruling on a declaratory petition[,]" *Lingle*, 107 Hawai'i at 185, 111 P.3d at 594, and, thus, there is no statute at issue that "mandate[s]" a hearing, *E & J Lounge*, 118 Hawai'i at 330, 189 P.3d at 442. Furthermore, the rule at issue here, HAR § 16–201–50, does not "mandate" a hearing insofar as it confers discretion to either "[d]eny the petition[,]" without having a hearing, "[s]et the petition for argument[,]" or "[a]ssign the petition to a hearings officer for further proceedings[.]" Because "the absolute right to ... a hearing is not provided by" the rule, *Bush v. Hawaiian Homes Comm'n*, 76 Hawai'i 128, 135, 870 P.2d 1272, 1279 (1994), there is no "regulatory mandate" for a hearing. *Id.* Finally, there is no constitutional right to a hearing. In this regard, the hearing would have been

controversy giving rise to the proceeding. *Where, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed; but the mere fact that an actual or threatened controversy is susceptible of relief through a general common law remedy, a remedy equitable in nature, or an*

*extraordinary legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment in any case where the other essentials to such relief are present.*

(Emphases added).

required by law only if "due process mandated such a hearing." *Id.* "The claim to a due process right to a hearing requires that the particular interest which the claimant seeks to protect be 'property' within the meaning of the due process clauses of the federal and state constitutions." *Id.* A property interest must involve "a legitimate claim of entitlement" and must be more than an "abstract need or desire[.]" *Id.* In the instant case, AlohaCare lacked a "property" interest because, at most, AlohaCare had a "unilateral expectation" of being awarded the QExA contract and not a "claim of entitlement[.]" *Id.* at 136, 870 P.2d at 1280. Because the Commissioner was not "required by law" to hold a hearing, the proceeding before the Commissioner did not constitute a contested case proceeding.

Furthermore, a contested case must determine the legal rights, duties, or privileges of specific parties. *E & J Lounge,* 118 Hawai'i at 330, 189 P.3d at 442. In the instant case, it does not appear that the Commissioner could have determined the "legal rights, duties, or privileges," *id.,* of AlohaCare or the other parties inasmuch as HRS § "91–8 does not authorize an agency to determine private rights[,]" or the legal rights duties, and privileges, of "specific parties" but is "designed to provide a means for securing from an agency its interpretation of relevant statutes, rules and orders[,]" where the *"only parties necessary to a proceeding under [§ ] 91–8 are the petitioner and the agency."* *Fasi,* 60 Haw. at 444, 591 P.2d at 118 (emphasis added). *Id.*

### B.

Likewise, the majority's second assertion, that AlohaCare can appeal because it was aggrieved under HRS § 91–14 by the Commissioner's decision, rests on the same incorrect proposition. Majority opinion at 637–39. The majority states that HAPA's statement of purpose does not clarify the legislature's intent with regard to standing and does not evidence an intent to impose a lower standing threshold on declaratory orders than on orders in contested cases. *See* majority opinion at 640 n. 34. But if the legislature intended to allow for judicial review of only

*some* orders (those in which the petitioner satisfied the criteria in contested cases), the legislature would have said so. The legislature could have said that it intended to allow review only of certain orders. It did not do so. Instead, as noted, the legislature's pronouncement was broad—HAPA was intended to *"provide for judicial review of agency decisions and orders."* Hse. Stand. Com. Rep. No. 8, in 1961 House Journal, at 655 (emphasis added); *see also Sierra Club,* 100 Hawai'i at 264, 59 P.3d at 899 (noting that HAPA applies to judicial review of "contested case hearings [under HRS § 91–14], or declaratory judgments by the circuit court on the validity of an agency rule, [under] HRS § 91–7, or a declaratory order from an agency regarding 'the applicability of any statutory provision or of any rule or order of the agency,' [under] HRS § 91–8").

In this regard, it cannot be said that AlohaCare did not argue that it had standing to appeal as an "interested person" under HRS § 91–8. *See* majority opinion at 632 n. 15, 32 n. 26 (stating that AlohaCare did not contend that it had standing to appeal as an interested person under HRS § 91–8). As the majority itself acknowledges, AlohaCare "argued [on appeal to the court] that the Insurance Commissioner's determination that AlohaCare had 'two bases for standing below,' i.e., as an interested party and as an aggrieved party, was not clearly erroneous." [ *Id.* at 21] AlohaCare also stated to the court that "AlohaCare is an aggrieved party, and, as such, it is afforded the right to appeal *by HRS §§ 91–8 and 91–14."* (Emphasis added.)

To reiterate, whether a party appealing a declaratory order is "aggrieved" by a "final decision and order in a contested case[,]" HRS § 91–14(a), is irrelevant to whether the party may appeal a declaratory order, inasmuch as declaratory orders under HRS § 91–8 have the "same status" as contested case orders with respect to appeals and, thus, are independently subject to judicial review. *Lingle,* 107 Hawai'i at 188, 111 P.3d at 597 (Acoba, J., concurring). The majority claims that because none of the parties in *Lingle* contested the appellant's standing to appeal,

whether an appellant must be "aggrieved" or merely "interested" was not before the court in *Lingle. See* majority opinion at 639–40.

But standing is a jurisdictional question, and appellate courts have an independent obligation to ensure jurisdiction over each case. *Bacon v. Karlin,* 68 Haw. 648, 650, 727 P.2d 1127, 1129 (1986). This court in *Lingle* was well aware that the case before it involved a challenge to its jurisdiction. *See* 107 Hawai'i at 184, 111 P.3d at 593 (reviewing challenge to circuit court's jurisdiction under HRS § 91–14). Nevertheless, it did *not* hold that a party could appeal a declaratory order entered under HRS § 91–8 only if the party was "aggrieved" pursuant to HRS § 91–14. Again, instead, *Lingle* held that, "*read together, HRS §§ 91–8 and 91–14* conferred jurisdiction upon the circuit court" to review an order disposing of a petition for a declaratory ruling. *Id.* at 185, 111 P.3d at 594 (emphasis added).

The majority asserts that *Lingle, Vail,* and *Kim* do not resolve expressly or impliedly whether an "interested person" may appeal a declaratory order that did not result from a contested case. *See* majority opinion at 639–40. This is not correct. The petitioners in *Lingle, Vail,* and *Kim* sought declaratory orders under HRS § 91–8. *Lingle,* 107 Hawai'i at 185–86, 111 P.3d at 594–95; *Vail,* 75 Haw. at 47–59, 856 P.2d at 1231–37; *see Kim,* 89 Hawai'i at 71–73, 968 P.2d at 1081–84. Their appeals were entertained by way of the procedure in HRS § 91–14, without any discussion regarding whether the petitioners were persons aggrieved or participated in contested case hearings. *Id.* Since HRS § 91–8 allows "interested persons" to seek a declaratory order, it follows that the petitioners in *Lingle, Vail,* and *Kim* were "interested persons" who were allowed to pursue their appeals by way of HRS § 91–14. *Id.* Lingle, *Vail,* and *Kim,* thus, answered the question whether an "interested person" under HRS § 91–8 may appeal a declaratory order utilizing the procedure in HRS § 91–14 in the affirmative. *Id.; see also Lingle,* 107 Hawai'i at 185, 111 P.3d at 594 ("[Appellant], however, contends that *the [agency's] order need not result from a contested case* and

that, read together, HRS §§ 91–8 and 91–14 conferred jurisdiction upon the circuit court. *We agree.*") (Emphases added).

## C.

As to the third assertion, the majority fails to explain why AlohaCare had to have suffered an injury in fact in order to appeal. For the reasons discussed in this opinion above, plainly, AlohaCare need not demonstrate such an injury under HRS § 91–8.

It is only in the contested case context that an aggrieved person "appears to be essentially synonymous with someone who has suffered 'injury in fact.'" *E & J Lounge,* 118 Hawai'i at 346 n. 35, 189 P.3d at 458 n. 35 (quoting *Ariyoshi v. Haw. Pub. Emp't Relations Bd.,* 5 Haw.App. at 540, 704 P.2d at 924). Within this framework, there is no requirement that an interested person appealing "by way of the procedure in HRS § 91–14," demonstrate an "injury-in-fact." *See Lingle,* 107 Hawai'i at 185, 111 P.3d at 594. HRS § 91–14 is merely the *procedural* vehicle by which an interested party can appeal an order issued under HRS § 91–8. *See Lingle,* 107 Hawai'i at 185, 111 P.3d at 594. Hence, being "aggrieved" or incurring a legal injury is not a condition for appeal under HRS § 91–8.

Under the majority's holding, however, interested parties must satisfy a new, *substantive* requirement in order to appeal. Now an interested party must show that it has suffered an "injury-in-fact" in order to seek judicial review even though a party need not show "injury-in-fact" to seek a declaration from an agency in the first place and this court has routinely entertained appeals of agency orders issued pursuant to HRS § 91–8, *see Lingle,* 107 Hawai'i at 185, 111 P.3d at 594.

To reiterate, an interested person should not have to show "injury-in-fact" inasmuch as the term "interested person" is more expansive than "person aggrieved." *Cf. Richard v. Metcalf,* 82 Hawai'i 249, 253, 921 P.2d 169, 173 (1996) ("[S]omeone who would have, or already has, qualified as an 'aggrieved person' under HRS § 91–14 (1993) certainly qualifies as an 'interested person' under HRS

§ 91–7[ [32]]."); *Life of the Land v. Land Use Comm'n of State of Hawai'i,* 63 Haw. 166, 178, 623 P.2d 431, 441 (1981) (noting that "plaintiffs were deemed 'aggrieved persons' in a prior case with similar allegations ... and further discussion here relative to their status as 'interested persons' [under HRS § 91–7] would definitely be redundant"). If only aggrieved parties who have suffered injury-in-fact could appeal declaratory rulings, as the majority effectively holds, one would have to posit that there is a class of petitioners that is "interested" enough to bring a petition seeking declaratory relief, but not sufficiently "aggrieved" to appeal an adverse agency order. Plainly this cannot be inasmuch as agency orders procured under HRS § 91–8 have the *same status* as other agency orders, such as contested case orders. *See* HRS § 91–8 ("Orders disposing of petitions in [declaratory relief] cases shall have the same status as other agency orders."); *see also Lingle,* 107 Hawai'i at 184, 111 P.3d at 593 (same); *id.* at 188–89, 111 P.3d at 597–98 (Acoba, J., concurring) (explaining that orders disposing of petitions for declaratory rulings have the same status as a final order in a contested case). Hence, the majority view is contrary to HRS § 91–8, which, by its own terms, provides a vehicle for interested persons to seek clarification from the agency regarding the applicability of statutes or rules administered by the agency without being aggrieved. *ZBA,* 114 Hawai'i at 197–98, 159 P.3d at 156–57.

### D.

As to the majority's fourth assertion, again, inasmuch as AlohaCare need not be aggrieved, whether AlohaCare's purported injury was "fairly traceable" to the Commissioner's decision or not is immaterial. In the same vein, the majority's assertion that a "[favorable] decision" for Alohacare "might eventually result in the voiding of the contracts by DHS," majority opinion at 639 n. 30, is in my view irrelevant, insofar as AlohaCare lacked standing to challenge whether the contracts were void in the appeal from the Commissioner's HRS § 91–8 ruling.[33] In the absence of AlohaCare's standing on this issue, the court could not rule on whether the contracts were void and the "possibility" that AlohaCare "would be relieved of competition from United and Ohana in bidding for such contracts," *see* majority opinion at 639, is immaterial. *See Kaho'ohanohano v. State,* 114 Hawai'i 302, 324, 162 P.3d 696, 718 (2007) ("[S]tanding is a jurisdictional issue that may be addressed at any stage of a case[.]") (Internal quotation marks and citation omitted).

As shown, *supra,* the instant proceeding did *not* result from a contested case, and, thus, AlohaCare has not been aggrieved [34] from a "final decision and order in a contested case." HRS § 91–14. Thus, respectfully, the majority's assumption that AlohaCare needed to have been aggrieved by the Commissioner's decision to appeal is wrong. *See*

---

**32.** HRS § 91–7(a) provides in pertinent part, "Any interested person may obtain a judicial declaration as to the validity of an agency rule. by bringing an action against the agency in the circuit court of the county in which petitioner resides or has its principal place of business."

**33.** To emphasize, the Commissioner could not determine whether the contracts were null and void because the RFP and QExA contracts were not a statutory provision, rule, or order administered by the DCCA, and, thus, were outside of the Commissioner's jurisdiction. *See ZBA,* 114 Hawai'i at 200, 159 P.3d at 159 ("Because HRS § 91–8 only allows for declaratory rulings as to questions of 'applicability,' an administrative agency has no discretion to issue rulings under this section that do not bear on such questions.").

**34.** HRS § 91–8 provides this court with jurisdiction to review a declaratory order, although "the

procedure in HRS § 91–14," *Lingle,* 107 Hawai'i at 190, 111 P.3d at 599 (Acoba, J., concurring), would set forth the procedural requirements in bringing the appeal. AlohaCare brought its declaratory petition seeking a declaratory order pursuant to HRS § 91–8 and, thus, was mistaken in bringing its appeal pursuant to HRS § 91–1 and HRS § 91–14 insofar as an "aggrieved status" was raised. However, AlohaCare's appeal can be construed as brought under HRS § 91–8, but utilizing the procedure in HRS § 91–14(b), since in its Statement of the Case before the circuit court Alohacare stated that the action arose "under [HAPA] Chapter 91" and that the court "[had] jurisdiction pursuant to HRS § 91–14(b)." AlohaCare argued both 91–8 and 91–14 in light of the disputed question of the basis for judicial review. Hence, AlohaCare's reference to HRS § 91–14 can be accepted as including the procedural requirements for seeking judicial review of an HRS 91–8 order, pursuant to case law.

*Lingle*, 107 Hawai'i at 184, 111 P.3d at 593 (noting that a party need not appeal from a contested case hearing to appeal a declaratory order).

## IX.

For the reasons stated herein, I concur with the determination that the court had jurisdiction to hear the declaratory petition under HRS § 91–8 insofar as AlohaCare had standing to appeal the question of whether an HMO license was necessary for the performance of the QExA contracts. Accordingly, I would affirm the court's judgment. However, I cannot agree that AlohaCare had to have been an aggrieved party in order to appeal the declaratory order or that, under the facts and for the reasons discussed above, AlohaCare had standing to seek a declaration that the contracts were void because it was "aggrieved," as the majority apparently holds.